CITY OF MEMPHIS ET AL. *v.* GREENE ET AL.

No. 79-1176. Argued December 3, 1980—Decided April 20, 1981

Stevens, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Powell, and Rehnquist, JJ., joined. White, J., filed an opinion concurring in the judgment, *post*, p. 129. Marshall, J., filed a dissenting opinion, in which Brennan and Blackmun, JJ., joined, *post*, p. 135.

*Clifford D. Pierce, Jr.*, argued the cause for petitioners. With him on the brief was *Charles V. Holmes.*

*Alvin O. Chambliss, Jr.*, argued the cause for respondents and filed a brief for respondent Greene. *A. C. Wharton, Jr., William L. Robinson, Beatrice Rosenberg, Richard S. Kohn,* and *Norman J. Chachkin* filed a brief for respondents Owens et al.*

---

*\*George E. Morrow* and *John G. McCleery, Jr.*, filed a brief for the Hein Park Civic Association as *amicus curiae* urging reversal.

*Doris Peterson* filed a brief for the Affirmative Action Coordinating Center et al. as *amici curiae* urging affirmance.

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether a decision by the city of Memphis to close the north end of West Drive, a street that traverses a white residential community, violated § 1 of the Civil Rights Act of 1866, Rev. Stat. § 1978, 42 U. S. C. § 1982, or the Thirteenth Amendment to the United States Constitution.[1] The city's action was challenged by respondents, who resided in a predominantly black area to the north. The Court of Appeals ultimately held the street closing invalid because it adversely affected respondents' ability to hold and enjoy their property. 610 F. 2d 395. We reverse because the record does not support that holding.

I

Most of the relevant facts concerning the geography, the decision to close the street, and the course of the litigation are not in dispute. The inferences to be drawn from the evidence, however, are subject to some disagreement.

A. *Geography*

Hein Park, a small residential community in Memphis, Tenn., is bounded on three sides by thoroughfares and on the west by the campus of Southwestern University. West Drive is a two-lane street about a half mile long passing through the center of Hein Park. Its southern terminus is a short distance from an entrance to Overton Park, a large recreation

---

[1] Section 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

The Thirteenth Amendment provides:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Section 2. Congress shall have power to enforce this article by appropriate legislation."

area containing, among other facilities, the municipal zoo.[2] Its northern terminus is at the intersection of Jackson Ave. and Springdale St., two heavily traveled four-lane avenues. West Drive is one of three streets that enter Hein Park from the north; two streets enter from the east.

The closing will have some effect on both through traffic and local traffic. Prior to the closing, a significant volume of traffic southbound on Springdale St. would continue south on West Drive and then—because of the location of Overton Park to the south of Hein Park—make either a right or a left turn to the next through street a few blocks away, before resuming the southerly route to the center of the city. The closing of West Drive will force this traffic to divert to the east or west before entering Hein Park, instead of when it leaves, but the closing will not make the entire route any longer. With respect to local traffic, the street closing will add some distance to the trip from Springdale St. to the entrance to Overton Park and will make access to some homes in Hein Park slightly less convenient.

The area to the north of Hein Park is predominantly black. All of the homes in Hein Park were owned by whites when the decision to close the street was made.

B. *City Approval*

In 1970, residents of Hein Park requested the city to close four streets leading into the subdivision. After receiving objections from the police, fire, and sanitation departments, the city denied the request.[3] In its report regarding the appli-

---

[2] Overton Park was described in *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 406:

"Overton Park is a 342-acre city park located near the center of Memphis. The park contains a zoo, a nine-hole municipal golf course, an outdoor theater, nature trails, a bridle path, an art academy, picnic areas, and 170 acres of forest."

[3] See Trial Exhibit 14. This history points up the distinction between what the local residents may request or desire and what action the city

104

cation, the city's Traffic Engineering Department noted that much of the traffic through the subdivision could be eliminated by closing West Drive at Jackson Ave. Trial Exhibit 14. Thereafter, on July 9, 1973, members of the Hein Park Civic Association filed with the Memphis and Shelby County Planning Commission a formal "Application to Close Streets or Alleys" seeking permission to close West Drive for 25 feet south of Jackson Ave. See Trial Exhibit 13, App. 135. The application was signed by the two property owners abutting both Jackson Ave. and West Drive and all but one of the other West Drive homeowners on the block immediately south of Jackson Ave. *Ibid.*[4] The stated reasons for the closing were:

"(1) Reduce flow of through traffic using subdivision streets.

"(2) Increase safety to the many children who live in the subdivision and those who use the subdivision to walk to Snowden Junior High School.

"(3) Reduce 'traffic pollution' in a residential area, e. g., noise, litter, interruption of community living." *Ibid.*

After receiving the views of interested municipal departments, the County Planning Commission on November 1, 1973, recommended that the application be approved with the conditions that the applicants provide either an easement for existing and future utility company facilities or the funds to relocate existing facilities and that the closure provide clearance for fire department vehicles. Trial Exhibit 4, App. 130. The City Council held a hearing at which both proponents and opponents of the proposal presented their views, and the Council adopted a resolution authorizing the closing

may authorize. It is, of course, the city's action that is challenged in this litigation.

[4] Only the signatures of the "abutting property owners" were required on the application.

subject to the conditions recommended by the Planning Commission. See Trial Exhibit 26. The city reconsidered its action and held additional hearings on later dates but never rescinded its resolution.[5] See Trial Exhibits 27–30, 41.

## C. *Litigation*

In a complaint filed against the city and various officials in the United States District Court for the Western District of Tennessee on April 1, 1974, three individuals and two civic associations, suing on behalf of a class of residents north of Jackson Ave. and west of Springdale St., alleged that the closing was unconstitutional and prayed for an injunction requiring the city to keep West Drive open for through traffic.[6] The District Court granted a motion to dismiss, holding that the complaint, as amended, failed to allege any injury to the plaintiffs' own property or any disparate racial effect,[7] and

---

[5] The opponents of the closing submitted to the Council written objections containing approximately 1,000 signatures.

[6] App. 4–5. In 1977, the District Court granted a motion to intervene made by three additional individual plaintiffs who lived north of Jackson Ave. *Id.*, at 46–54. The class ultimately certified by the District Court consisted of "black persons in the City of Memphis who own or stand to inherit property surrounding and adjoining the area along West Drive and Hein Park Subdivision." Stipulation of Parties as to Maintenance of Cause as a Rule 23 (b)(2) Class Action, Record Doc. No. 23; Order Granting Motion to Amend and Certification of Class Action, App. 67. The original complaint also challenged the city's action in striking from the municipal budget the construction of a $750,000 federal-state financed community center in the plaintiffs' neighborhood. *Id.*, at 4. No question related to that challenge remains in the litigation.

[7] "None of the plaintiffs [live] on West Drive; none are deprived of reasonable ingress and egress to their property; the street is not proposed to be closed to blacks and open to whites. In short, the effect of the proposed closing, whether wise or unwise, is the same upon whites as it is to blacks. *Palmer* v. *Thompson*, 403 U. S. 217 . . . . There is no facial discriminatory import to the resolution of closure, and there is no assertion that it will be implemented or administered in a racially discriminatory fashion or effect. Plaintiffs complain only that they will be denied access

that they had no standing as affected property owners to raise procedural objections to the city's action.[8]

The United States Court of Appeals for the Sixth Circuit reversed. The court first noted that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." 535 F. 2d 976, 978. The court concluded that respondents' complaint, fairly construed, alleged that the city had conferred certain benefits—"to wit, the privacy and quiet of an exclusive dead-end street"—on white residents that it refused to confer on similarly situated black residents. Ibid. Accordingly, the court held that if respondents could prove that city officials conferred the benefit of a closed street on West Drive residents "because of their color," respondents would have a valid claim under either 42 U. S. C. § 1982 or § 1983. 535 F. 2d, at 979.[9]

Following the remand, the case was transferred to Judge McRae for trial. Respondents amended their pleadings and, in pretrial discovery, reviewed all street closings in Memphis during the prior 10-year period as well as the entire record

to West Drive from the north just as every other citizen will be." Id., at 29–30 (footnote omitted).

[8] "Plaintiffs have no constitutional property rights in continued access to West Drive under the facts asserted or on the basis asserted in the complaint. They have no standing as affected property owners on the street to due process notice and hearing." Id., at 31.

[9] The Court of Appeals summarized its holding as follows:

"To establish a section 1982 or 1983 claim on remand, Greene must prove his allegations that city officials conferred the closed street on West Drive residents because of their color; he must prove racial motivation, intent or purpose, in the absence of such egregious differential treatment as to in itself violate equal protection or, alternatively, to command an inference of racial motivation. . . .

". . . According to the instant complaint allegations, the closing of West Drive left certain white residents with privacy and quiet of a dead-end street, though black residents, for racial reasons, have been and would be unable to acquire such a dead-end street." 535 F. 2d, at 979–980.

concerning the closing of West Drive. An elaborate pretrial order entered on February 9, 1978, identified three contested issues of fact:

"(a) Whether the defendants, by closing West Drive, have conferred certain benefits on white residents of West Drive that they have refused to confer on similarly situated black neighborhoods because of their color.

"(b) Whether a discriminatory purpose was a motivating factor in the decision of the City Council to close West Drive.

"(c) Whether the defendants and their agents complied with the normal procedural sequence in processing the application to close a portion of West Drive. If not, the extent to which they failed to comply." App. 87.

After a full trial Judge McRae filed a detailed memorandum decision in which he found against the respondents on each of the three contested issues of fact. He specifically concluded that the action of the City Council closing West Drive "did not create a benefit for white citizens which has been denied black citizens";[10] that racially discriminatory intent or purpose had not been proved;[11] and that the city

---

[10] "Upon a consideration of the facts established, this Court concludes that the action of the City Council which undertakes to close West Drive did not create a benefit for white citizens which has been denied black citizens. The proof shows that this is the only time that the street and alley closing procedure has been used to close a street which serves as a thoroughfare for the residents and the public. From the standpoint that the closing procedure has been used to close alleys and dedicated but unused streets, the proof shows that the procedure has benefited black citizens as well as white citizens." App. 159.

[11] "This Court concludes that the closure of West Drive in the manner adopted by the City Council will have disproportionate impact on certain black citizens. However, the Court also concludes that there is not sufficient proof of racially discriminatory intent or purpose on the part of the city officials to establish a constitutional violation.

"As heretofore indicated, by placing the narrow barrier at the intersection of West Drive and Jackson, the southbound overwhelmingly black

had not departed significantly from normal procedures in authorizing the closing.[12]  Accordingly, the District Court entered judgment for the city.

The Court of Appeals did not reject any of the District Court's findings of fact.  The Court of Appeals did hold, however, that Judge McRae had erred by limiting his focus to the issue of whether the city had granted a street closing application made by whites while denying comparable benefits to blacks.  610 F. 2d, at 400–401.  Although the Court of Appeals recognized that the reasoning of its earlier opinion could have induced such a narrow focus, and that the record supported Judge McRae's findings on this issue, the court held that the respondents need not show that the city had denied street-closing applications submitted by black neighborhoods to show a violation of § 1982.  610 F. 2d, at 400–

---

traffic will no longer be allowed to continue a logical and direct route across Jackson.  At the same time the white residents of West Drive will have considerably less traffic.  The residents of West Drive also will have less inconvenience because most of their movement will logically take them southbound on departure and northbound on return.

"However, this Court does not believe that the disparate impact is so stark that a purpose or intent of racial discrimination may be inferred. It must be noted that excessive traffic in any residential neighborhood has public welfare factors such as safety, noise, and litter, regardless of the race of the traffic and the neighborhood.

.          .          .          .          .

"Similarly this Court does not find a purpose or intent to racially discriminate based upon a consideration of other evidence in the case as directed in *Arlington Heights v. Metropolitan Housing Corp.,* [429 U. S. 252, 267–268.]"  *Id.,* at 161–162.

[12] Respondents had contended that procedural defects violated state law and the Due Process Clause of the Fourteenth Amendment, and also provided evidence of an intent to discriminate.  Judge McRae considered and rejected each of these contentions.  *Id.,* at 149–153, 162–163.  Although the briefs and oral arguments in this Court contained discussion of procedural issues, inasmuch as the Court of Appeals did not rely upon such issues and we find no error in their treatment by the District Court, they will not be further discussed.

402.   Rather, the court held that respondents could demonstrate that this particular street closing was a "badge of slavery" under § 1982 and the Thirteenth Amendment without reference to the equal treatment issue.[13]

The Court of Appeals recognized that a street closing may be a legitimate and effective means of preserving the residential character of a neighborhood and protecting it from the problems caused by excessive traffic.   610 F. 2d, at 402.   The Court of Appeals concluded, however, that relief under § 1982 was required here by the facts: (1) that the closing would benefit a white neighborhood and adversely affect blacks; (2) that a "barrier was to be erected precisely at the point of separation of these neighborhoods and would undoubtedly have the effect of limiting contact between them"; (3) that the closing was not part of a citywide plan but rather was a "unique step to protect one neighborhood from outside influences which the residents considered to be 'undesirable'"; and (4) that there was evidence of "an economic depreciation in the property values in the predominantly black residential area."[14]   Before addressing the legal issues, we consider the

---

[13] The court purported to leave open the question whether intent is ever an element of a plaintiff's § 1982 case.   610 F. 2d, at 404, n. 13.

[14] The Court of Appeals summarized its holding in this paragraph:

"Without endeavoring to establish any legal guidelines for the determination of when conduct may amount to a badge of slavery, we find the determinations made by the district court here to be altogether adequate to bring the conduct complained of within that description.   The community to be benefited by the closing was and had historically been all white. Conversely, the territory to be burdened by the closing was predominantly black.   The barrier was to be erected precisely at the point of separation of these neighborhoods and would undoubtedly have the effect of limiting contact between them.   The proposed closing was not enacted in response to any uniform city planning effort, directed generally to the preservation of the residential neighborhoods throughout the city; instead it appears to have been a unique step to protect one neighborhood from outside influences which the residents considered to be 'undesirable.'   Finally, there was some evidence, credited by the district court, of an economic deprecia-

extent to which each of these conclusions is supported by the record and the District Court's findings.

## D. *The Evidence*

The first of the four factual predicates for the Court of Appeals' holding relates to the effect of the closing on black residents and is squarely rooted in the District Court's findings. Judge McRae expressly found that the City Council action "will have disproportionate impact on certain black citizens." App. 161. He described the traffic that will be diverted by the closing as "overwhelming black," *ibid.*, and noted that the white residents of West Drive will have less inconvenience.[15] We must note, however, that although neither Judge McRae nor the Court of Appeals focused on the extent of the inconvenience to residents living north of Jackson Ave., the record makes it clear that such inconvenience will be minimal. A motorist southbound on Springdale St. could continue south on West Drive for only a half mile before the end of West Drive at Overton Park would neces-

___

tion in the property values in the predominantly black residential area with a corresponding increase in the property values in Hein Park. The result, under the unique circumstances here, can only be seen as one more of the many humiliations which society has historically visited upon blacks. Where that racial humiliation not only rises to the level of a badge of slavery but also affects the right of blacks to hold property in the same manner as other citizens, then Section 1982 has been violated and the federal courts must provide a suitable remedy." *Id.*, at 404 (footnote omitted).

[15] Judge McRae noted that the West Drive residents will have the benefit of less traffic and will be inconvenienced less than the black residents living north of Jackson Ave., because the movement of the West Drive residents "will logically take them southbound on departure and northbound on return." App. 161. Judge McRae plainly stated his opinion that the street closing was unwise because it will interfere with the provision of municipal services and encourage vandalism in the neighborhood. *Ibid.* He clearly concluded, however, that the adverse impact on blacks was greater than on whites.

sitate a turn.[16]   Thus unless the motorist is going to Overton Park, the only effect of the street closing for traffic proceeding south will be to require a turn sooner without lengthening the entire trip or requiring any more turns.[17] Moreover, even the motorist going to Overton Park had to make a turn from West Drive and a short drive down North Parkway to reach the entrance to the park.   The entire trip from Springdale St. to the park will be slightly longer with West Drive closed, but it will not be significantly less convenient.[18]   Thus although it is correct that the motorists who

---

[16] Robert Miller, Executive Director of the Planning Commission testified:

"[T]he Planning Commission and council didn't think that closing this intersection would really impede the traffic because West Drive didn't go anywhere anyway.   It is not like closing a major street in this area that goes for miles and miles and go into strategic landmarks in Memphis, strategic locations that people are getting to."   Tr. 206.

One City Council member expressed surprise that anyone from north of Jackson Ave. would want to use West Drive inasmuch as West Drive is a two-lane street with no traffic light, and the alternative routes are four-lane streets with traffic lights.   See Trial Exhibit 26, pp. 32–33 (remarks of Mr. Hyman).

[17] Although the street closing will also have an effect on motorists driving north along West Drive and will make the homes of the plaintiff class less accessible, the location of Overton Park will prevent motorists from using West Drive as a direct northern route.

[18] See Tr. 164–165.   The District Court summarized one respondent's claim of inconvenience:

"Plaintiff N. T. Greene testified at the trial in this Court that the closure would compound the multitude of negative experiences that he has encountered as a black person.   He complained that the closure would prevent convenient vehicular access to various facilities contained in Overton Park and would cause him, his family and neighbors psychological and emotional damage.   His home is located on Terry Circle in Memphis, Tennessee, which is northwest from the intersection of West Drive and Jackson Avenue (T. E. 22).   Insofar as his use of West Drive to and from his residence, the closure would cause him no actual inconvenience."   App. 154.

Mr. Greene lives 1½ miles from the Jackson Ave.-West Drive intersec-

will be inconvenienced by the closing are primarily black, the extent of the inconvenience is not great.

As for the Court of Appeals' second point, the court attached greater significance to the closing as a "barrier" between two neighborhoods than appears warranted by the record. The physical barrier is a curb that will not impede the passage of municipal vehicles.[19] Moreover, because only one of the several streets entering Hein Park is closed to vehicular traffic, the other streets will provide ample access to the residences in Hein Park.[20] The diversion of through traffic around the Hein Park residential area affects the diverted motorists, but does not support the suggestion that such diversion will limit the social or commercial contact between residents of neighboring communities.[21]

___

tion. See Tr. 45. A portion of Mr. Greene's testimony is quoted in the dissenting opinion, post, at 140, n. 3.

[19] The District Court described the closing as follows:

"The partial closing will be accomplished by having the northernmost property owners on West Drive buy a 25-foot east-west strip across the entire width of the street. Because officials of certain departments of the city deem it necessary that public service vehicles will be able to cross the strip, a 24-foot gap will be left in the barricade. There will be a speed breaker across the gap, but other details, such as signs, have not been finalized." App. 148–149.

[20] The District Court summarized the testimony of one witness who testified about the actual difficulty involved in reaching Hein Park homes:

"Mrs. Elnora Priest Cross, an intervening plaintiff, testified that she would like to be able to go through West Drive. She has a friend who works at the home of someone who lives on West Drive and contacts her in the event of an emergency.[2]

"[2] Mrs. Cross will still be able to reach her friend; however, she will be inconvenienced by having to use a different route." App. 154.

Mrs. Cross lives 3½ miles to the northwest of the Jackson Ave.-West Drive intersection. Tr. 62. A portion of Mrs. Cross' testimony is quoted in the dissenting opinion, post, at 140, n. 3.

[21] Whether the closing will have the effect of barring pedestrians from access to West Drive from Jackson Ave. is not entirely clear from the record. At trial Judge McRae asked Robert Miller, the Executive Director of the Planning Commission, whether the City Council resolution,

The Court of Appeals' reference to protecting the neighborhood from "undesirable" outside influences may be read

---

which stated that the portion of West Drive to be deeded to the property owners abutting West Drive and Jackson Ave. was to be "closed to the public," meant that the public could not walk across the property. The question produced the following testimony:

"THE WITNESS: No. I don't think it means that. I think it was closed to vehicular traffic.

"THE COURT: All right.

"THE WITNESS: I think if you want to walk through there you still can do that according to the plan. There is not a high curb there, it is sort of like a roll curb, but the intended closing was for the obstruction of vehicular traffic.

"THE COURT: Do you think that that has been made plain to these—

"THE WITNESS: (Interjecting) I believe so. That was brought out at the hearings.

"There was no intention not to let people walk on through there if they wanted to, to my knowledge.

"THE COURT: Are you going to be happy if somebody tries to stop a pedestrian and have them say, 'Bob Miller said I could do this.'

"THE WITNESS: Well, all I can indicate to you—well, let me say this. There are conditions imposed in that closing. Emergency vehicles can plow on through that.

"THE COURT: That is not the public though.

"THE WITNESS: No, that is not the public, that is the city. I think the intent of the thing was not to fence it so that nobody could walk through. But to plant it, put a roll curb in there and to completely discourage the use of automobiles through that portion that is closed; automobiles, trucks, what have you—vehicles.

"THE COURT: All right.

"Thank you Mr. Miller." Tr. 215–216.

Mr. Miller later admitted, however, that the portion of the street deeded by the city would become part of the lots of the abutting property owners, that the only restrictions on the deeds would be those requiring access by municipal vehicles, and that pedestrians walking across the strip of land would be walking across private property. *Id.*, at 218–219. The abutting property owners did not testify at trial, and the District Court made no finding on this issue. The Court of Appeals noted that although the record was unclear as to whether the abutting property owners would, in fact, bar all foot traffic, "it is clear that the proposed conveyance will leave them with the absolute right to do so if they wish . . . ." 610 F. 2d, at 396.

as suggesting that the court viewed the closure as motivated by the racial attitude of the residents of Hein Park. The District Court's findings do not support that view of the record. Judge McRae expressly discounted the racial composition of the traffic on West Drive in evaluating its undesirable character; he noted that "excessive traffic in any residential neighborhood has public welfare factors such as safety, noise, and litter, regardless of the race of the traffic and the neighborhood." App. 161. The transcript of the City Council hearings indicates that the residents of West Drive perceived the traffic to be a problem because of the number and speed of the cars traveling down West Drive.[22] Even if the statements of the residents of West Drive are discounted as self-serving, there is no evidence that the closing was motivated by any racially exclusionary desire.[23] The City Council members who favored the closing expressed concerns similar to those of the West Drive residents.[24] Those who

---

[22] Dr. Bill Weber, a resident of West Drive, stated in support of the closing that traffic studies had counted 1,600 to 1,700 cars per 12-hour period traveling down West Drive and 200 cars per hour during the peak morning and afternoon periods. He stated that "we feel this is excessive traffic for a residential area." Trial Exhibit 26, p. 11. Mrs. Betsy Robbins, another resident of West Drive, stated:

"We're an active part of our area. This is our area. But in the midst of our interests in the whole area we found that one of the major problems is on our own doorstep. The hazardous traffic on West Drive. Our greatest worry here is children. . . . In addition to all the children on the street, each school morning and afternoon about 150 youngsters cross West Drive at my corner going to and from Snowden School. The stop sign on this corner is frequently ignored by swift traffic. Daily, I find myself rushing to the window when I hear screeching brakes. I'm terrified that some driver has hit a child." Id., at 15.

[23] We must bear in mind that respondents have sued the city, the Mayor, and the City Council and its chairman. Therefore, we must focus on the decisions of these public officials, and not on the actions of the residents of Hein Park, in determining whether respondents have proved their claim.

[24] One Council member stated that the major streets running parallel to West Drive to the east and to the west are only six-tenths of a mile apart

opposed the resolution did so because they believed that a less drastic response to the traffic problems would be adequate and that the closing would create a dangerous precedent.[25] The one witness at trial who testified that "someone" soliciting signatures for a petition favoring the closure had described the traffic on West Drive as "undesirable traffic," stated that the solicitor mentioned excess traffic and danger to children as reasons for signing.[26] Unlike the Court of Ap-

---

and "are designed to be thoroughfares." West Drive, however, "is not designed and never was designed to be a thoroughfare" bearing the burden of heavy traffic. *Id.*, at 31–32 (remarks of Mrs. Awsumb). Another Council member stated from personal experience that traffic was heavy on West Drive even at night and expressed doubt that a compromise, such as speedbreakers at the intersection of West Drive and Jackson Ave., would be sufficient to stop the "hotrodders." *Id.*, at 31 (remarks of Mr. Love). The Council discussed a traffic study which showed that 22,505 vehicles entered the West Drive-North Parkway intersection during a 12-hour period, and that 820 of these cars exited from West Drive onto North Parkway. *Id.*, at 34.

[25] In moving for reconsideration of the Council resolution, Councilman Alissandratos stated:

"While I certainly feel for particular neighborhood and appreciate the fact that they want to maintain a high standard of a neighborhood, we are still involved with a street that is operated and maintained by taxpayers money and I think it would be an injustice to close it, in addition to the fact that it would be establishing a very dangerous president [*sic*] in the rest of the City." Trial Exhibit 27, p. 2.

See also *id.*, at 3, 4 (remarks of Mr. James). The Council members who opposed the closing preferred a compromise solution to the traffic problem, such as a low speed limit and speedbreakers. See Trial Exhibit 26, p. 28 (remarks of Mr. Davis); *ibid.* (remarks of Mr. Ford); *id.*, at 29–31 (remarks of Mr. Alissandratos).

[26] Mrs. Terry, the one resident of the block of West Drive closest to Jackson Ave. who did not sign the application to close the street and who testified against the closing at the City Council hearing, testified as follows at the trial:

"Q. Were you approached by anyone who asked you to sign this petition? A. Yes.

"Q. Did they give you any reason as to why they would like to have you sign their petition? A. That there was excess traffic on the street and

peals, we therefore believe that the "undesirable" character of the traffic flow must be viewed as a factor supporting, rather than undermining, the validity of the closure decision. To the extent that the Court of Appeals' opinion can be read as making a finding of discriminatory intent, the record requires us to reject that finding in favor of the District Court's contrary conclusion. Judge McRae expressly found that the respondents had not proved that the City Council had acted with discriminatory intent. App. 161.[27]

it was dangerous for children. It was my understanding that trash was thrown out of windows of cars and stuff like that so it made our street littered.

"Q. Based on what was told to you during those encounters, did you gain the impression that there was any racial consideration? A. At one point someone said to us; the person who was passing the petition, that the traffic on the street was undesirable traffic. And I did not ask what that person meant.

"Q. Did they make any reference to the people of North Memphis? A. Just the people coming through Hein Park.

"Q. How did they describe them? A. This was just one statement, that the traffic was undesirable traffic. But now, you see I did not ask a question to pursue that." App. 114–115.

Even if Mrs. Terry did receive the impression that the person who spoke to her considered the traffic undesirable because of the race of the drivers, that isolated bit of hearsay evidence is not sufficient to justify a Court of Appeals' finding that the City Council was motivated by racial animus when the District Court made a contrary finding on the basis of the record as a whole.

[27] As JUSTICE MARSHALL correctly notes in dissent, the city of Memphis continued to oppose the prompt desegregation of its municipal parks and recreational facilities as late as 1963, see *Watson* v. *Memphis*, 373 U. S. 526, cited *post,* at 144, n. 10, and 152; moreover, the pre-World War II development of Hein Park may well have been influenced by the racial segregation which was then common, see *post,* at 137, and the record contains evidence that racial prejudice still exists in Memphis, see *post,* at 142, n. 7. We agree with JUSTICE MARSHALL that these facts are relevant, but we cannot say that they required the District Court to find that the City Council's action *in this case* was racially motivated, or that its contrary finding is erroneous as a matter of law. Indeed, JUSTICE MARSHALL's own interpretation of the record is somewhat ambivalent since he sometimes

Finally, the Court of Appeals was not justified in inferring that the closure would cause "an economic depreciation in the property values in the predominantly black residential area . . . ." 610 F. 2d, at 404. The only expert testimony credited by the District Court on that issue was provided by a real estate broker called by the plaintiffs.[28] His expert opinion, as summarized by the District Court, was that "there would not be a decrease in value experienced by property owners located to the north of West Drive because of the closure." App. 155. After the witness had expressed that opinion, he admittedly speculated that some property owners to the north might be envious of the better housing that they could not afford and therefore might be less attentive to the upkeep of their own property, which in turn "could have a detrimental effect on the property values in the future."[29]

---

refers to the evidence as supporting a "strong inference" of racial motivation, *post*, at 153, and elsewhere implies that the city's action was taken " 'solely because of . . . race,' " see *ibid.* The record plainly does not support a conclusion that the residents of Hein Park would have welcomed the heavy flow of transient traffic through their neighborhood if the drivers had been predominantly white. It is unlikely that a mother who finds herself "rushing to the window when I hear screeching brakes," see n. 22, *supra,* is concerned about the race of the driver of the vehicle.

[28] One of the named respondents and a class member also offered their opinion as to the effect of the closing on the value of their homes. Respondent Greene expressed the opinion that the enhancement of the value of the white-owned homes and the restricted accessibility of his home would have a detrimental effect on the value of his home. Tr. 38. One homeowner who lived to the north of Jackson Ave. expressed the opinion that the street closing would depreciate the value of his property because it would increase the amount of traffic on his street. *Id.*, at 128. The record does not support the suggestion that the closing will affect the traffic flow north of Jackson Ave. or impede access to any residence to the north. Neither the Court of Appeals nor the District Court relied on the testimony of these two witnesses.

[29] Because any adverse effect on property values has critical importance in our consideration of § 1982, we quote the relevant testimony of the witness Moore in full:

"Q. Now, Mr. Moore, what effect, if any, would this proposed closure

In our opinion the District Court correctly refused to find an adverse impact on black property values based on that speculation.[30]

have on the property values in the Springdale area; just across Jackson there? A. I am intimately familiar with the Springdale area, having been a real estate agent who more or less was instrumental in providing some houses for those in low economic groups in that area.

"From an economic standpoint there would not be a lessening of value in those properties in the Springdale area, but from a psychological standpoint, it would have a tendency to have a demoralizing—

"Mr. Holmes: (Interjecting) I object to that answer. He is not qualified as an expert in psychological opinions.

"Mr. Wharton: Well, if he would like to strike that whole answer, we don't have a problem with that.

"Mr. Holmes: Well, we only object to the psychological evaluation. He has stated that the property values in and of themselves would not go down.

.          .          .          .          .

"The Court: Right.

"Mr. Wharton: From his real estate background.

"Q. (By Mr. Wharton) Would you please continue with your response, Mr. Moore? A. In my opinion, with the 17 years experience in the real estate industry, psychologically it would have a deterring, depressing effect on those individuals who might live north of the Hein Park area. With the closure of the street, the creation of another little haven, the fact that these people are in a lower economic social group and wouldn't be able to actually afford housing with the illustrious price tags of those houses in the Hein Park area, it would be, in my opinion, like the individual looking in the pastry store who doesn't have a dime and who can't afford it. And consequently, as a result of such, their moralistic values on their properties could tend to be such that the upkeep would not be nearly so great and it could have a detrimental effect on the property values in the future." App. 111–112.

[30] Plaintiffs also called Dr. Feit, a clinical assistant professor in the Department of Psychiatry, University of Tennessee Center of Health Sciences, as an expert witness. The District Court summarized Dr. Feit's testimony as follows:

"Dr. Marvin Feit, an assistant professor at the University of Tennessee School of Social Work, testified that it was his opinion that closing West Drive would result in negative consequences in the form of hostility towards the people who live in Hein Park, increased vandalism, school

In summary, then, the critical facts established by the record are these: The city's decision to close West Drive was motivated by its interest in protecting the safety and tranquility of a residential neighborhood. The procedures followed in making the decision were fair and were not affected by any racial or other impermissible factors. The city has conferred a benefit on certain white property owners but there is no reason to believe that it would refuse to confer a comparable benefit on black property owners. The closing has not affected the value of property owned by black citizens, but it has caused some slight inconvenience to black motorists.

## II

Under the Court's recent decisions in *Washington* v. *Davis*, 426 U. S. 229, and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, the absence of proof of discriminatory intent forecloses any claim that the official action challenged in this case violates the Equal Protection Clause of the Fourteenth Amendment. Petitioners ask us to hold that respondents' claims under § 1982 and the Thirteenth Amendment are likewise barred by the absence of proof of discriminatory purpose. We note initially that the coverage of both

harassment, and increased arrests by police. He also was of the opinion that the closure would result in more disgruntled drivers." *Id.*, at 155.

Over defendants' objection that he was testifying to matters outside his area of expertise, see Tr. 106–110, Dr. Feit also testified as follows:

"Q Before the luncheon recess we were at the point of asking Dr. Feit to give his professional opinion as to the negative psychological consequences of the possible closure of West Drive and how those consequences might affect property values, and I will ask you to answer that question.

"A Well, particularly on the north of Jackson it is very likely that the property values will go down, whereas in Hein Park it is most likely that they will rise equal to the rather exclusive area; whereas the area north of Jackson will go down because of the increase in the volume of traffic which has nowhere to go." *Id.*, at 118–119.

The District Court did not credit this testimony.

§ 1982 and the Thirteenth Amendment is significantly different from the coverage of the Fourteenth Amendment. The prohibitions of the latter apply only to official action, or, as implemented by 42 U. S. C. § 1983 (1976 ed., Supp. III), to action taken under color of state law. We have squarely decided, however, that § 1982 is directly applicable to private parties, *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409; cf. *Runyon* v. *McCrary*, 427 U. S. 160, 170–174; and it has long been settled that the Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases*, 109 U. S. 3, 20. Thus, although respondents challenge official action in this case, the provisions of the law on which the challenge is based cover certain private action as well. Rather than confront prematurely the rather general question whether either § 1982 or the Thirteenth Amendment requires proof of a specific unlawful purpose, we first consider the extent to which either provision applies at all to this street closing case. We of course deal first with the statutory question.

### III

Section 1982 provides:

> "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

To effectuate the remedial purposes of the statute, the Court has broadly construed this language to protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens. Thus, in *Hurd* v. *Hodge*, 334 U. S. 24, the Court refused to permit enforcement of private covenants imposing racial restrictions on the sale of property even though the legal rights of blacks

to purchase or to sell other property were unimpaired.[31]   In *Jones, supra,* we held that § 1982 "must encompass every racially motivated refusal to sell or rent."    392 U. S., at 421–422.[32]   In *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, we interpreted the term "lease" in § 1982 to include an assignable membership share in recreational facilities.[33]   In *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410 U. S.

---

[31] The Court stated:

"The Negro petitioners entered into contracts of sale with willing sellers for the purchase of properties upon which they desired to establish homes. Solely because of their race and color they are confronted with orders of court divesting their titles in the properties and ordering that the premises be vacated.   White sellers, one of whom is a petitioner here, have been enjoined from selling the properties to any Negro or colored person. Under such circumstances, to suggest that the Negro petitioners have been accorded the same rights as white citizens to purchase, hold, and convey real property is to reject the plain meaning of language."   334 U. S., at 34.

[32] The Court indicated that Congress had the power, through the passage of § 1982, to eradicate such discrimination:

"At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live.   If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep."   392 U. S., at 443.

[33] Little Hunting Park, Inc., was a corporation organized to operate recreational facilities for the benefit of residents of Fairfax County, Va. A person holding a membership share who rented his home to another was entitled to assign his share to the lessee.   This Court held that both the lessor and the lessee had a cause of action under § 1982 for the corporation's refusal, on racial grounds, to approve such an assignment.   The Court held that the membership was part of the lease and that the right to lease was specifically guaranteed by § 1982:

"There has never been any doubt but that Freeman paid part of his $129 monthly rental for the assignment of the membership share in Little Hunting Park. . . .   Respondents' actions in refusing to approve the assignment of the membership share in this case was clearly an interference with Freeman's right to 'lease.'"   396 U. S., at 236–237.

431, we extended that holding to cover a preference to purchase a nontransferable swim club membership.[34] Although these cases broadly defined the property rights protected by § 1982, our cases, like the statutory language itself, all concerned the right of black persons to hold and acquire property on an equal basis with white persons and the right of blacks not to have property interests impaired because of their race.[35]

[34] Any resident of a geographical area within a ¾-mile radius of the swim club received three preferences: the right to apply for membership without seeking the recommendation of a current member, a preference over nonresidents when applying for a vacancy, and the right to pass to the successor in title of his home the first option on the membership. 410 U. S., at 436. The Court held that these preferences conferred property rights on the owner of a home in the area of the swim club that could not be denied on the basis of the homeowner's race. The Court noted that the right to confer an option on a subsequent purchaser could have an effect on the value of a home. Furthermore:

"[T]he automatic waiting-list preference given to residents of the favored area may have affected the price paid by the Presses when they bought their home. Thus the purchase price to them, like the rental paid by Freeman in *Sullivan,* may well reflect benefits dependent on residency in the preference area. For them, however, the right to acquire a home in the area is abridged and diluted.

"When an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area. The mandate of 42 U. S. C. § 1982 then operates to guarantee a nonwhite resident, who purchases, leases, or holds this property, the same rights as are enjoyed by a white resident." *Id.,* at 437.

[35] The lower federal courts have also required plaintiffs alleging a violation of § 1982 to demonstrate some impairment of property interests. In *Wright* v. *Salisbury Club, Ltd.,* 632 F. 2d 309 (CA4 1980), the court held that the right to join a country club was a property interest attaching to a home in a subdivision when all residents of the subdivision were encouraged to join the club and residency as a practical matter assured approval of an application. See, *e. g., Moore* v. *Townsend,* 525 F. 2d 482 (CA7 1975) (discriminatory refusal to sell home); *Clark* v. *Universal Builders, Inc.,* 501 F. 2d 324 (CA7) (allegation that blacks forced to accept prices and terms in excess of terms available to whites purchasing

Therefore, as applied to this case, the threshold inquiry under § 1982 must focus on the relationship between the street closing and the property interests of the respondents. As the Court of Appeals correctly noted in its first opinion, the statute would support a challenge to municipal action benefiting white property owners that would be refused to similarly situated black property owners. For official action of that kind would prevent blacks from exercising the same property rights as whites. But respondents' evidence failed to support this legal theory. Alternatively, as the Court of Appeals held in its second opinion, the statute might be violated by official action that depreciated the value of property owned by black citizens. But this record discloses no effect on the value of property owned by any member of the respondent class. Finally, the statute might be violated if the street closing severely restricted access to black homes, because blacks would then be hampered in the use of their property. Again, the record discloses no such restriction.[36]

comparable housing stated claim under § 1982), cert. denied, 419 U. S. 1070 (1974); *Gore* v. *Turner*, 563 F. 2d 159 (CA5 1977) (discriminatory refusal to lease apartment); *Scott* v. *Eversole Mortuary*, 522 F. 2d 1110 (CA9 1975) (alleged discrimination in sale of burial plots); *Concerned Tenants Assn.* v. *Indian Trails Apartments*, 496 F. Supp. 522 (ND Ill. 1980) (§ 1982 applies to abandonment of services previously provided to white tenants of apartment complex and now denied to black tenants); *Newbern* v. *Lake Lorelei, Inc.*, 308 F. Supp. 407 (SD Ohio 1968) (discrimination in modes of negotiation for sale of property); *Sims* v. *Order of Commercial Travelers of America*, 343 F. Supp. 112 (Mass. 1972) (insurance contracts constitute property for purposes of § 1982); *Gonzalez* v. *Southern Methodist University*, 536 F. 2d 1071 (CA5 1976) (no property interest in law school admission), cert. denied, 430 U. S. 987 (1977).

[36] The absence of such restriction distinguishes this case from the Fifth Circuit's decision in *Jennings* v. *Patterson*, 488 F. 2d 436 (1974). In *Jennings*, the defendants placed a barricade across a street on the outskirts of Dadeville, Ala., and prohibited landowners on the other side of the barricade from using the street. All but one of the landowners so restricted were black, and the one white landowner was given private access to the closed street. The street closing had the effect of adding 1½

The injury to respondents established by the record is the requirement that one public street rather than another must be used for certain trips within the city. We need not assess the magnitude of that injury to conclude that it does not involve any impairment to the kind of property interests that we have identified as being within the reach of § 1982. We therefore must consider whether the street closing violated respondents' constitutional rights.

## IV

In relevant part, the Thirteenth Amendment provides:

> "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

In this case respondents challenge the conferring of a benefit upon white citizens by a measure that places a burden on black citizens as an unconstitutional "badge of slavery." Relying on Justice Black's opinion for the Court in *Palmer* v. *Thompson*, 403 U. S. 217, the city argues that in the absence of a violation of specific enabling legislation enacted pursuant to § 2 of the Thirteenth Amendment, any judicial characterization of an isolated street closing as a badge of slavery would constitute the usurpation of "a law-making power far beyond the imagination of the amendment's authors." *Id.*, at 227.[37]

Pursuant to the authority created by § 2 of the Thirteenth

---

to 2 miles to the trip into town. The court held that the plaintiffs, "because they are black, have been denied the right to hold and enjoy their property on the same basis as white citizens." *Id.*, at 442. Thus *Jennings*, unlike this case, involved a severe restriction on the access to property. See *supra*, at 110–112, and nn. 15–18.

[37] In *Palmer*, the Court rejected petitioners' claim that a city's decision to close public swimming pools rather than desegregate them violated the Thirteenth Amendment. The Court noted that § 2 of the Amendment gave Congress the power to eradicate "badges of slavery," and that Congress had not prohibited the challenged conduct. 403 U. S., at 227.

Amendment, Congress has enacted legislation to abolish both the conditions of involuntary servitude and the "badges and incidents of slavery." [38] The exercise of that authority is not inconsistent with the view that the Amendment has self-executing force. As the Court noted in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S., at 439:

> " 'By its own unaided force and effect,' the Thirteenth Amendment 'abolished slavery' and established universal freedom.' *Civil Rights Cases*, 109 U. S. 3, 20. Whether or not the Amendment *itself* did any more than that—a question not involved in this case—it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more." [39]

In *Jones*, the Court left open the question whether § 1 of the Amendment by its own terms did anything more than abolish

---

[38] In addition to § 1982, which we have identified as providing broad protection to property rights, Congress has enacted, pursuant to § 2 of the Thirteenth Amendment, Rev. Stat. § 1977, 42 U. S. C. § 1981, which protects the right of all citizens to enter into and enforce contracts, see *Runyon* v. *McCrary*, 427 U. S. 160, 170; cf. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 440–441; Rev. Stat. § 1980, 42 U. S. C. § 1985 (3) (1976 ed., Supp. III), which protects blacks from conspiracies to deprive them of "the equal protection of the laws, or of equal privileges and immunities under the laws," see *Griffin* v. *Breckenridge*, 403 U. S. 88, 104–105; Rev. Stat. § 1990, 42 U. S. C. § 1994, which prohibits peonage, see *Pollock* v. *Williams*, 322 U. S. 4, 8; and 18 U. S. C. § 1581, which provides for criminal punishment of those who impose conditions of peonage on any person, see *Clyatt* v. *United States*, 197 U. S. 207, 218.

[39] The Court continued:
"For that clause clothed 'Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.*' *Ibid.* (Emphasis added.)

"Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 392 U. S., at 439–440.

slavery.[40]  It is also appropriate today to leave that question open because a review of the justification for the official action challenged in this case demonstrates that its disparate impact on black citizens could not, in any event, be fairly characterized as a badge or incident of slavery.

We begin our examination of respondents' Thirteenth Amendment argument by reiterating the conclusion that the record discloses no racially discriminatory motive on the part of the City Council.[41]  Instead, the record demonstrates that the interests that did motivate the Council are legitimate. Proper management of the flow of vehicular traffic within a city requires the accommodation of a variety of conflicting interests: the motorist's interest in unhindered access to his destination, the city's interest in the efficient provision of municipal services, the commercial interest in adequate parking, the residents' interest in relative quiet, and the pedestrians' interest in safety.  Local governments necessarily exercise wide discretion in making the policy decisions that accommodate these interests.

In this case the city favored the interests of safety and tranquility.  As a matter of constitutional law a city's power to adopt rules that will avoid anticipated traffic safety problems is the same as its power to correct those hazards that have been revealed by actual events.  The decision to reduce the flow of traffic on West Drive was motivated, in part, by

---

[40] In *Jones* the Court did hold, of course, that § 2 of the Amendment, which in terms merely authorized the enactment of legislation to enforce § 1, did more than authorize legislation to enforce the ban against slavery. See nn. 32, 38, *supra*.  Although the Court expressly overruled *Hodges* v. *United States*, 203 U. S. 1, see 392 U. S., at 441–443, n. 78, the Court neither agreed nor disagreed with the first Justice Harlan's statement in dissent in *Hodges* that "by its own force, that Amendment destroyed slavery and all its incidents and badges, and established freedom." See 203 U. S., at 27.

[41] See *supra*, at 106–108, 113–116, and nn. 22–27.

an interest in the safety of children walking to school.[42] That interest is equally legitimate whether it provides support for an arguably unnecessary preventive measure or for a community's reaction to a tragic accident that adequate planning might have prevented. See *Thomas Cusack Co.* v. *Chicago,* 242 U. S. 526.

The residential interest in comparative tranquility is also unquestionably legitimate. That interest provides support for zoning regulations, designed to protect a "quiet place where yards are wide, people few, and motor vehicles restricted . . . ." *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, 9; *Arlington County Board* v. *Richards,* 434 U. S. 5, and for the accepted view that a man's home is his castle. The interest in privacy has the same dignity in a densely populated apartment complex, cf. *Payton* v. *New York,* 445 U. S. 573, or in an affluent neighborhood of single-family homes.[43] In either context, the protection of the individual interest may involve the imposition of some burdens on the general public.

Whether the individual privacy interests of the residents of Hein Park, coupled with the interest in safety, should be considered strong enough to overcome the more general interest in the use of West Drive as a thoroughfare is the type of question that a multitude of local governments must resolve every day. Because there is no basis for concluding that the interests favored by the city in its decision were contrived or pretextual, the District Court correctly concluded that it had no authority to review the wisdom of the city's policy decision. See *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 109.

---

[42] See nn. 22–25 and accompanying text, *supra.*

[43] As the Court in *Village of Belle Terre* noted:

"The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." 416 U. S., at 9.

The interests motivating the city's action are thus sufficient to justify an adverse impact on motorists who are somewhat inconvenienced by the street closing. That inconvenience cannot be equated to an actual restraint on the liberty of black citizens that is in any sense comparable to the odious practice the Thirteenth Amendment was designed to eradicate. The argument that the closing violates the Amendment must therefore rest, not on the actual consequences of the closing, but rather on the symbolic significance of the fact that most of the drivers who will be inconvenienced by the action are black.

But the inconvenience of the drivers is a function of where they live and where they regularly drive—not a function of their race; the hazards and the inconvenience that the closing is intended to minimize are a function of the number of vehicles involved, not the race of their drivers or of the local residents. Almost any traffic regulation—whether it be a temporary detour during construction, a speed limit, a one-way street, or a no-parking sign—may have a differential impact on residents of adjacent or nearby neighborhoods. Because urban neighborhoods are so frequently characterized by a common ethnic or racial heritage, a regulation's adverse impact on a particular neighborhood will often have a disparate effect on an identifiable ethnic or racial group. To regard an inevitable consequence of that kind as a form of stigma so severe as to violate the Thirteenth Amendment would trivialize the great purpose of that charter of freedom. Proper respect for the dignity of the residents of any neighborhood requires that they accept the same burdens as well as the same benefits of citizenship regardless of their racial or ethnic origin.

This case does not disclose a violation of any of the enabling legislation enacted by Congress pursuant to § 2 of the Thirteenth Amendment. To decide the narrow constitutional question presented by this record we need not speculate about the sort of impact on a racial group that might be

prohibited by the Amendment itself. We merely hold that the impact of the closing of West Drive on nonresidents of Hein Park is a routine burden of citizenship; it does not reflect a violation of the Thirteenth Amendment.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE, concurring in the judgment.

In this civil rights action, respondents sought relief under the Thirteenth and Fourteenth Amendments as well as under 42 U. S. C. §§ 1982, 1983. The District Court held that while the closure of West Drive in Memphis, Tenn., would have a disproportionate impact upon certain black residents of Memphis, the evidence did not support a finding of a purpose or intent to discriminate. Neither was the disparate impact "so stark that a purpose or intent of racial discrimination" could be inferred. As a consequence, and following instructions from the initial remand, the District Court concluded that respondents had failed to prove a violation of either § 1982 or § 1983.[1] The District Court did not specifically address the alleged constitutional violations, but implicity those allegations fell on the same basis. The Court of Appeals for the Sixth Circuit reversed the District Court's ultimate conclusion that there was no violation of § 1982, but the appellate court did not disturb the trial court's finding that there was no purposeful discrimination. Without

---

[1] The initial opinion of the Court of Appeals instructed the District Court as follows:

"To establish a section 1982 or 1983 claim on remand, Greene must prove his allegations that city officials conferred the closed street on West Drive residents because of their color; he must prove racial motivation, intent or purpose, in the absence of such egregious differential treatment as to in itself violate equal protection or, alternatively, to command an inference of racial motivation." 535 F. 2d 976, 979.

In the opinion rendered by the Court of Appeals following the initial remand, the above language was described as dicta.

130

explicitly saying so, the Court of Appeals necessarily held that a violation of § 1982 could be established without proof of discriminatory intent.[2] The petition for a writ of certiorari sought review of that precise point.

We granted review to answer the question presented in the petition for a writ of certiorari. The parties in their briefs proceeded on the same assumption. However, instead of addressing the question which was explicitly presented by the findings and holdings below, raised by the petitioners, granted review by this Court and briefed by the parties, the Court inexplicably assumes the role of factfinder, peruses the cold record, rehashes the evidence, and *sua sponte* purports to resolve questions that the parties have neither briefed nor argued. It is not surprising that the dissent has taken this same record and interpreted it in quite another way. In any event, rather than becoming involved in the imbroglio between the majority and the dissent, I much prefer as a matter of policy and common sense to answer the question for which we took the case. There is no good reason here to disregard our own Rule 21.1 (a), which states that "[o]nly the questions set forth in the petition or fairly included therein will be considered by the Court."

We are called upon to determine whether a nonintentional adverse impact upon black citizens is a sufficient basis for relief under 42 U. S. C. § 1982. That statute declares that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Under that language, a person's

---

[2] Respondents' § 1983 claim based on the Fourteenth Amendment necessarily fell on the District Court's conclusion that respondents had failed to meet their burden of establishing discriminatory intent. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977); *Washington* v. *Davis*, 426 U. S. 229 (1976). The Court of Appeals did not hold otherwise. Nor is the reach of the Thirteenth Amendment properly before us. The Court of Appeals' judgment was based on § 1982.

race is irrelevant to the existence of the declared rights. No person is to be denied the enumerated rights merely because that person is not white. Purposeful racial discrimination is quite clearly the focus of the proscription, and this understanding of § 1982 is supported by the legislative history of the Civil Rights Act of 1866, the enactment from which § 1982 was derived.

The Civil Rights Act of 1866 was enacted pursuant to § 2 of the Thirteenth Amendment. That Amendment had been adopted by the States in 1865 after the close of the Civil War. It announced the legal demise of slavery.[3]  Section 2 of the Amendment provides: "Congress shall have power to enforce this article by appropriate legislation." Although slavery was legally abolished, the Amendment foresaw that specific implementation of its command would be required to eradicate completely the deep-seated institution of slavery. The Civil Rights Act of 1866 was explicitly designed as such a practical measure.

When the 39th Congress undertook consideration of the proposed Civil Rights Act of 1866, there was a growing perception that the plight of the southern blacks had not been resolved by the adoption of the Thirteenth Amendment.[4]  In

---

[3] Section 1 of the Thirteenth Amendment provides:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

[4] The fear that the former slaves were doomed to second-class citizenship was supported by the report submitted by Major General Carl Schurz to President Andrew Johnson. S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865). President Johnson had assigned Schurz the task of traveling through a number of Southern States for the purpose of gathering information and making observations as to the postwar conditions to be found in that region. The report is a detailed and lucid account of these journeys. In it, Schurz describes the precarious social position of the freedmen as well as the numerous abuses to which those individuals were being subjected. The report expressed the general view that the South was having difficulty adjusting to the abolition of slavery and that in the

the words of one contemporary observer: "The general government of the republic has, by proclaiming the emancipation of the slaves, commenced a great social revolution in the south, but has, as yet, not completed it. Only the negative part of it is accomplished. The slaves are emancipated in point of form, but free labor has not yet been put in the place of slavery in point of fact." S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 38 (1865). Individual Southern States had begun enacting the so-called Black Codes,[5] which, although not technically resurrecting the institution of slavery, were viewed by the Republican Congress as a large step in that direction. See generally H. Flack, Adoption of the Fourteenth Amendment 11–54 (1908). In addition, there was evidence that former slaves were being subjected to serious abuses at the hands of the white majority. See Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., xvii and *passim* (1866). The proposed Civil Rights Act was specifically designed to stem this tide of oppression. See *Jones*

---

absence of federal intervention, a substitute for slavery was not unlikely. Schurz' report concludes with the admonition: "As to the future peace and harmony of the Union, it is of the highest importance that the people lately in rebellion be not permitted to build up another 'peculiar institution' whose spirit is in conflict with the fundamental principles of our political system; for as long as they cherish interests peculiar to them in preference to those they have in common with the rest of the American people, their loyalty to the Union will always be uncertain." *Id.*, at 46. The themes sounded in this report were repeated in the debates over the Civil Rights Act.

[5] Apropos of the effect of these Black Codes, Major General Schurz commented: "But while accepting the 'abolition of slavery,' they think that some species of serfdom, peonage, or some other form of compulsory labor is not slavery, and may be introduced without a violation of their pledge. . . . What particular shape the reactionary movement will assume it is at present unnecessary to inquire. There are a hundred ways of framing apprenticeship, vagrancy, or contract laws, which will serve the purpose." *Id.*, at 35. The Codes are collated and described in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 29–44 (1871).

v. *Alfred H. Mayer Co.*, 392 U. S. 409, 426–429, and nn. 34–45 (1968). Senator Trumbull, sponsor of the bill, made this precise purpose of the Act abundantly clear:

> "Since the abolition of slavery, the Legislatures which have assembled in the insurrectionary States have passed laws relating to the freedmen, and in nearly all the States they have discriminated against them. They deny them certain rights, subject them to severe penalties, and still impose upon them the very restrictions which were imposed upon them in consequence of the existence of slavery, and before it was abolished. The purpose of the bill under consideration is to destroy all these discriminations, and to carry into effect the constitutional amendment." Cong. Globe, 39th Cong., 1st Sess., 474 (1866).

The theme sounded by Senator Trumbull was repeated on numerous occasions during the lengthy floor debates which took place in both Houses of Congress. The supporters of the bill emphasized time and again that the measure was designed to eradicate blatant deprivations of civil rights. See, *e. g., id.*, at 322, 339–340, 474–475, 516–517, 1123, 1151–1152, 1159–1160, 1833–1835. The purpose of the Act was to insure that the abolition of slavery was accomplished in fact as well as theory:

> "[The Thirteenth Amendment] declared that all persons in the United States should be free. This measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect, unless the persons who are to be affected by them have some means of availing themselves of their benefits. . . . And of what avail will it now be that the Constitution of the United States has declared that slavery shall not exist, if in the late slaveholding States laws

are to be enacted and enforced depriving persons of African descent of privileges which are essential to freemen?

"It is the intention of this bill to secure those rights." *Id.*, at 474 (remarks of Sen. Trumbull).

The Civil Rights Act of 1866 thus was a response to the perception held by Congress that former slaves were being denied basic civil rights. The Act would give practical effect to the Thirteenth Amendment. "The bill under consideration is intended only to carry into practical effect the amendment of the Constitution. Its object is to declare not only that slavery shall be abolished upon the pages of your Constitution, but that it shall be abolished in fact and in deed . . . ." *Id.*, at 1152 (remarks of Mr. Thayer). But nothing in the legislative history of this Act suggests that Congress was concerned with facially neutral measures which happened to have an incidental impact on former slaves.[6]

---

[6] Respondents suggest that certain of the discriminations with which Congress was concerned arose out of facially neutral vagrancy laws, applicable equally to blacks and whites. From this we are to infer the creation of a disparate-impact standard. But this argument overlooks the congressional view that these ostensibly neutral statutes were intentionally being used to oppress blacks. "Vagrant laws have been passed; laws which, under the pretense of selling these men as vagrants, are calculated and intended to reduce them to slavery again; and laws which provide for selling these men into slavery in punishment of crimes of the slightest magnitude . . . ." Cong. Globe, 39th Cong., 1st Sess., 1123 (1866) (remarks of Mr. Cook); see also *id.*, at 1151 (remarks of Mr. Thayer), 1160 (remarks of Mr. Windom). For example, General Terry ordered non-enforcement of the Virginia Vagrant Act since he had concluded that white farmers had entered into combinations fixing the wages to be paid former slaves at an unreasonably low level, forcing the freedmen to either accept the unfair wage or risk criminal conviction under the Vagrant Act. General Terry observed:

" 'The effect of the statute in question will be, therefore, to compel the freedmen, under penalty of punishment as criminals, to accept and labor for the wages established by these combinations of employers. It places

On the contrary, the theme of the debates surrounding this statute is that the former slaves continued to be subject to direct, intentional abuses at the hands of their former masters. That was the problem Congress intended to address and that focus should determine the reach and scope of this statute. We have no basis for concluding anything other than that a violation of § 1982 requires some showing of racial animus or an intent to discriminate on the basis of race. The Court of Appeals proceeded on a contrary basis and reversed the District Court's judgment without disturbing the District Court's conclusion that no discriminatory purpose had been found. This was error, and for that reason I concur in the judgment of reversal, but would remand for further proceedings consistent with this opinion.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

This case is easier than the majority makes it appear. Petitioner city of Memphis, acting at the behest of white property owners, has closed the main thoroughfare between an all-white enclave and a predominantly Negro area of the city. The stated explanation for the closing is of a sort all

---

them wholly in the power of their employers, and it is easy to foresee that, even where no such combination now exists, the temptation to form them offered by the statute will be too strong to be resisted, and that such inadequate wages will become the common and usual wages throughout the State. The ultimate effect of the statute will be to reduce the freedmen to a condition of servitude worse than that from which they have been emancipated—a condition which will be slavery in all but its name.' " McPherson, *supra* n. 5, at 41–42.

The objection to the vagrancy laws was not to their disproportionate impact, but to the intentional use of those statutes to impose upon freedmen a system tantamount to slave labor. See also Kohl, The Civil Rights Act of 1866, Its Hour Come Round at Last: *Jones v. Alfred H. Mayer Co.*, 55 Va. L. Rev. 272, 276–283 (1969). Some of these vagrancy laws were not race neutral. The Vagrant Act of Mississippi was directed only at unemployed freedmen. See McPherson, *supra* n. 5, at 30.

too familiar: "protecting the safety and tranquility of a residential neighborhood" by preventing "undesirable traffic" from entering it. Too often in our Nation's history, statements such as these have been little more than code phrases for racial discrimination. These words may still signify racial discrimination, but apparently not, after today's decision, forbidden discrimination. The majority, purporting to rely on the evidence developed at trial, concludes that the city's stated interests are sufficient to justify erection of the barrier. Because I do not believe that either the Constitution or federal law permits a city to carve out racial enclaves I dissent.

## I

In order to determine "whether the State 'in any of its manifestations' has become significantly involved in private discriminations," it is necessary to " 'sif[t] facts and weig[h] circumstances' " so that " 'nonobvious involvement of the State in private conduct [can] be attributed its true significance.' " *Reitman* v. *Mulkey*, 387 U. S. 369, 378 (1967), quoting *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 722 (1961). The key to the majority's conclusion is the view that it takes of the facts, and consequently I will review the relevant parts of the record in some detail.

The majority treats this case as involving nothing more than a dispute over a city's race-neutral decision to place a barrier across a road. My own examination of the record suggests, however, that far more is at stake here than a simple street closing. The picture that emerges from a more careful review of the record is one of a white community, disgruntled over sharing its street with Negroes, taking legal measures to keep out the "undesirable traffic," and of a city, heedless of the harm to its Negro citizens, acquiescing in the plan.

I readily accept much of the majority's summary of the circumstances that led to this litigation. I would, however,

begin by emphasizing three critical facts. First, as the District Court found, Hein Park "was developed well before World War II as an exclusive residential neighborhood for white citizens and these characteristics have been maintained." App. 148. Second, the area to the north of Hein Park, like the "undesirable traffic" that Hein Park wants to keep out, is predominantly Negro. And third, the closing of West Drive stems entirely from the efforts of residents of Hein Park. Up to this point, the majority and I are in agreement. But we part company over our characterizations of the evidence developed in the course of the trial of this case. At the close of the evidence, the trial court described this as "a situation where an all white neighborhood is seeking to stop the traffic from an overwhelmingly black neighborhood from coming through their street." Tr. 323. In the legal and factual context before us, I find that a revealing summary of the case. The majority apparently does not.

According to the majority, the Court of Appeals concluded that respondents were entitled to relief based on four facts that the panel gleaned from the District Court's findings. These facts were:

> "(1) that the closing would benefit a white neighborhood and adversely affect [Negroes]; (2) that a 'barrier was to be erected precisely at the point of separation of these neighborhoods and would undoubtedly have the effect of limiting contact between them'; (3) that the closing was not part of a citywide plan but rather was a 'unique step to protect one neighborhood from outside influences which the residents considered to be "undesirable"'; and (4) that there was evidence of 'an economic depreciation in the property values in the predominantly black residential area.'" *Ante,* at 109 (footnote omitted).

By purportedly examining the evidence supporting each of the four points, the majority is able to conclude that the court below was mistaken and that the only effect of the closing

of West Drive is "some slight inconvenience to black motorists." *Ante,* at 119. A more detailed study of the record convinces me, to the contrary, that the Court of Appeals was entirely justified in each of its conclusions.

The majority does not seriously dispute the first of the four facts relied on by the Court of Appeals. In fact it concedes that the trial court "clearly concluded . . . that the adverse impact on blacks was greater than on whites." *Ante,* at 110, n. 15. The majority suggests, however, that this "impact" is limited to the "inconvenience" that will be suffered by drivers who live in the predominantly Negro area north of Hein Park and who will no longer be able to drive through the subdivision. This, says the majority, is because residents of the area north of Hein Park will still be able to get where they are going; they will just have to go a little out of their way and thus will take a little longer to complete the trip.

This analysis ignores the plain and powerful symbolic message of the "inconvenience." Many places to which residents of the area north of Hein Park would logically drive lie to the south of the subdivision.[1] Until the closing of West Drive, the most direct route for those who lived on or near Springdale St. was straight down West Drive. Now the Negro drivers are being told in essence: "You must take the long way around because you don't live in this 'protected' white neighborhood." Negro residents of the area north of Hein Park testified at trial that this is what they thought the city was telling them by closing West Drive. See, *e. g.,* Tr. 22–23, 34 (testimony of N. T. Greene); *id.,* at 64 (testimony of Eleanore Cross). See also *id.,* at 111 (testimony of

---

[1] As the majority notes, *ante,* at 103, n. 2, Hein Park is bordered on the south by Overton Park, which contains numerous municipally owned outdoor attractions. In fact, the entire central city lies south of Hein Park. Negro residents drive down West Drive for purposes as diverse as going to visit friends, Tr. 36 (testimony of N. T. Greene), and just looking at the scenery, *id.,* at 63 (testimony of Eleanore Cross).

Dr. Marvin Feit). Even the District Court, which granted judgment for petitioners, conceded that "[o]bviously, the black people north of. [Hein Park] . . . are being told to stay out of the subdivision." *Id.,* at 317. In my judgment, this message constitutes a far greater adverse impact on respondents than the majority would prefer to believe.[2]

The majority also does not challenge the Sixth Circuit's second finding, that the barrier is being erected at the point of contact of the two communities. Nor could it do so, because the fact is not really in dispute. The Court attempts instead to downplay the significance of this barrier by calling it "a curb that will not impede the passage of municipal vehicles." *Ante,* at 112. But that is beside the point. Respondents did not bring this suit to challenge the exclusion of municipal vehicles from Hein Park. Their goal is to preserve access for their own vehicles. But in fact, they may not even be able to preserve access for their own persons. The city is creating the barrier across West Drive by deeding public property to private landowners. Nothing will prevent the residents of Hein Park from excluding "undesirable" pedestrian as well as vehicular traffic if they so choose. See Tr. 136, 217–219, 317–318. What *is* clear is that there will be a barrier to traffic that *is* to be erected precisely at the point where West Drive (and thus, all-white Hein Park) ends and Springdale St. (and the mostly Negro section) begins.

The psychological effect of this barrier is likely to be significant. In his unchallenged expert testimony in the trial court, Dr. Marvin Feit, a professor of psychiatry at the University of Tennessee, predicted that the barrier between West Drive and Springdale St. will reinforce feelings about the city's "favoritism" toward whites and will "serve as a monument to racial hostility." *Id.,* at 103, 104–105. The testi-

---

[2] As I discuss *infra,* at 145–147, I also conclude that as a result of the closing, Negro property owners in the area north of Hein Park will suffer substantial impairments in both the enjoyment and value of their property.

mony of Negro residents and of a real estate agent familiar with the area provides powerful support for this prediction.[3] As the District Court put it: "[Y]ou are not going to be able to convince those black people out there that they didn't do it because they were black. They are helping a white neighborhood. Now, that is a problem that somebody is going to have to live with . . . ." *Id.*, at 325. I cannot subscribe to the majority's apparent view that the city's erection of this "monument to racial hostility" amounts to nothing more than a "slight inconvenience." Thus, unlike the majority, I do not minimize the significance of the barrier itself in determining the harm respondents will suffer from its erection.[4]

The majority does not attempt to question the third conclusion by the Court of Appeals, that the closing of West Drive is intended as a protection of Hein Park against "undesirable" outside influences. Rather, its disagreement with

---

[3] One Negro resident, N. T. Greene, testified: "[B]ecause we are Black, we cannot drive through a piece of property that is owned collectively by us. This would cause psychological damage to me personally." Tr. 23. He added that he perceived the barrier as "simply an extension of the insult and humiliation that we have tolerated and experienced too long already." *Id.*, at 39. Another resident, Eleanore Cross, was asked how she would feel if West Drive were closed. She responded: "That would put a fear on me that if they said, 'Closed,' that means 'Closed,' and that would mean put a fear on me." *Id.*, at 64. One of respondents' expert witnesses, real estate agent H. C. Moore, testified that he anticipated similar effects. See *infra*, at 145–146.

[4] The majority makes much of the fact that even after the closing of West Drive, three other streets are available for access into Hein Park. Of these, however, only one, Charles Place, which is west of West Drive and parallel to it, is arguably convenient. But drivers coming down West Drive have to go out of their way to reach Charles Place. There is, moreover, nothing to prevent the white property owners along Charles Place from seeking to close it at the northern end, for they could surely come up with reasons as vague as those set forth for the closing of West Drive itself. In any event, the fact remains that predominantly Negro traffic is being disadvantaged for the exclusive benefit of a community that was designed to be, and still remains, entirely white.

the Court of Appeals is over the inference to be drawn.   The majority insists that to the extent that the Court of Appeals found racially discriminatory intent, that finding is not supported by the record.   The majority also asserts, *ante,* at 114, that there is "no evidence" that either the residents of Hein Park or the city officials were motivated by any racial considerations.   A proper reading of the record demonstrates to the contrary that respondents produced at trial precisely the kind of evidence of intent that we deemed probative in *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 267–268  (1977).[5]

The term "undesirable traffic" first entered this litigation through the trial testimony of Sarah Terry.   Terry, a West

---

[5] In *Arlington Heights* we explained:

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.   The impact of the official action—whether it 'bears more heavily on one race than another' . . . —may provide an important starting point.   Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . But such cases are rare [and ordinarily] impact alone is not determinative, and the Court must look to other evidence.

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.   The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.   Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

"The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. . . .

"The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."   429 U. S., at 266–268  (citations and footnotes omitted).

142

Drive resident who opposed the closing, testified that she was urged to support the barrier by an individual who explained to her that "the traffic on the street was undesirable traffic." Tr. 140.[6] The majority apparently reads the term "undesirable" as referring to the prospect of having any traffic at all on West Drive. But the common-sense understanding of Terry's testimony must be that the word "undesirable" was meant to describe the traffic that was actually using the street, as opposed to any traffic that might use it. Of course, the traffic that was both actually using the street and would be affected by the barrier was predominantly Negro.[7]

But Terry's testimony is not, as the majority implies, the only *Arlington Heights*-type evidence produced at trial. The testimony of city planning officials, for example, strongly suggests that the city deviated from its usual procedures in deciding to close West Drive. In particular, despite an unambiguous requirement that applications for street closings be signed by "all" owners of property abutting on the thoroughfare to be closed, the city here permitted this application to go through without the signature or the consent of

---

[6] Terry's testimony on this point is set forth in full in the majority opinion, *ante,* at 115–116, n. 26.

[7] Emmanuel Goldberger, a white citizen who opposed the closing of West Drive but who died before trial, explained in testimony before the City Council some of the reasons that he considered the closing racially motivated:

"Mr. Chairman, there's been enough said about the number of cars, or the speed of the cars going on West Drive. You know and I know that that isn't the issue . . . .

"But if you want me to, I will spell it out for you. Mr. Chairman, the answer is sitting right here. The well-to-do white people living in Hein Park do not want black people or the few of us who refuse to run away living north of Jackson to drive on . . . what they think is their street. I phoned a man—I phoned a man with whom I have been friendly for more than 65 years. His wife answered and would not let me speak to him. So as the rights and wrongs were discussed, she said to me[,] 'Leo and I were surprised to see you sitting with that group of niggers.' That[,] Mr. Chairman[,] is the issue here." Ex. 30, p. 1.

Sarah Terry.[8] Perhaps more important, the city gave no notice to the Negro property owners living north of Hein Park that the Planning Commission was considering an application to close West Drive. The Planning Commission held its hearing without participation by any of the affected Negro residents and it declined to let them examine the file on the West Drive closing. It gave no notice that the City Council would be considering the issue. When respondents found out about it, they sought to state their case. But the Council gave opponents of the proposal only 15 minutes, even though some members objected that that was not enough time. Furthermore, although the majority treats West Drive as just another closing, it is, according to the city official in charge of closings, the *only* time the city has *ever* closed a street for traffic control purposes. Tr. 297–298 (testimony of Paul Goldstein). See *id.*, at 313, 321–322 (comments of trial judge). And it cannot be disputed that all parties were aware of the disparate racial impact of the erection of the barrier.[9] The city of Memphis, moreover, has an

---

[8] City officials asserted at trial that there is no requirement that the opinions of affected property owners be solicited before a street is closed, and the District Court found that there had been no substantial departure from usual practices. But the city's own application forms state that they must be signed by "[a]ll owners abutting the thoroughfare to be closed." App. 137. At trial, city officials took the position that this language only refers to individuals owning property abutting at the point of the closing. If that is accurate, then on the city's theory, any two property owners living across a street from one another could seek to close it, and the city would have no obligation to consult any other residents at all before approving the closing. Put gently, such testimony is contrary to common sense and not worthy of great deference.

[9] During the brief City Council hearing, residents of the area north of Hein Park presented petitions with approximately 1,000 signatures protesting the closing of West Drive, stating: "This Closing symbolizes in unmistakable terms a White neighborhood shutting its door on its adjacent Black and integrated communities." These petitions made express reference to the racial impact. Witnesses before the Council also made reference to the racial character of the neighborhoods involved. See, *e. g.*,

unfortunate but very real history of racial segregation—a history that has in the past led to intercession by this Court.[10] All these factors represent precisely the kind of evidence that we said in *Arlington Heights* was relevant to an inquiry into motivation. Regardless of whether this evidence is viewed as conclusive, it can hardly be stated with accuracy that "no evidence" exists.[11]

---

Ex. 30, pp. 2–3, 6, 7, 11. The trial judge took judicial notice of the fact that the area to the north of Hein Park was predominantly Negro, and he added: "[I]f the City Council didn't know that that property coming up to Jackson Avenue [northern boundary of Hein Park] was predominently [*sic*] black, then I have got my doubts about them." Tr. 324.

[10] See *Watson* v. *Memphis*, 373 U. S. 526 (1963).

[11] I do not mean by this discussion to imply that a showing of discriminatory motivation is required before a violation of § 1982 may be made out. I merely suggest that if such a finding is required, the record in this case contains considerable evidence from which it could be made. See n. 14, *infra*. Nor am I deterred by the trial court's conclusion that no discriminatory motive was involved in the closing of West Drive. The Court of Appeals disagreed with this finding because the panel believed that the District Judge "conceived himself limited in his capability to grant relief by the language in [the first opinion] and that he placed too high a threshold upon the requirements of Section 1982 and, underlying it, the Thirteenth Amendment." 610 F. 2d 395, 402. In its first opinion, the panel discussed § 1982 only insofar as it related to the city's willingness to grant a white community a benefit (the closing of a street) that was denied to a Negro community. 535 F. 2d 976, 978 (1976). Much of the evidence presented at trial concerned this issue, and some of the comments of the trial judge suggest that he might have thought it the only one to be decided. In fact, § 1982 encompasses considerably more than the granting of a benefit to a white community when the same right is denied to Negroes. For example, a violation of the statute might be made out through a showing that a benefit was granted to a white community in such a manner that it harmed Negro property rights. See *infra*, at 148–149. Thus if the District Court in fact thought that respondents could show a violation of § 1982 only by showing that they had been denied a benefit granted to white residents, it was applying an improper legal standard in considering whether there was discrimination. This likelihood that the District Court indeed applied an improper standard must in turn taint the finding that intentional discrimination

Most important, I believe that the findings of the District Court and the record in this case fully support the Court of Appeals' conclusion that Negro property owners are likely to suffer economic harm as a result of the construction of the barrier. In attempting to demonstrate to the trial court that the closing of West Drive would adversely affect their property, respondents first introduced the testimony of H. C. Moore, a real estate agent with 17 years' experience in the field. Moore began by predicting that after West Drive was closed, Hein Park would become "more or less a Utopia within the city of Memphis," families who had left the inner city for the suburbs would probably return in order to live there, and the property values in Hein Park "would be enhanced greatly." Tr. 91–92. Moore was then asked what effect the closing would have on the property values in the Springdale area. He responded: "From an economic standpoint there would not be a lessening of value in those properties in the Springdale area, but from a psychological standpoint, it would have a tendency to have a demoralizing—." *Id.*, at 92. At this point, counsel for petitioners interposed an objection, but Moore was eventually permitted to answer the question, and he testified as follows:

> "In my opinion, with the 17 years experience in the real estate industry, psychologically it would have a deterring, depressing effect on those individuals who might live north of the Hein Park area. With the closure of the street, the creation of another little haven, the fact that these people are in a lower economic social group and wouldn't be able to actually afford housing with the illustrious price tags of those houses in the Hein Park

was absent. Thus, to the extent that the majority reaches its conclusion through reliance on that finding by the District Court, it is relying on a fact not properly found. The appropriate response in this situation should be to instruct the Court of Appeals to remand the case to the District Court for reconsideration of the evidence under the correct legal standard.

area, it would be, in my opinion, like the individual looking in the pastry store who doesn't have a dime and who can't afford it. And consequently, as a result of such, their moralistic values on their properties could tend to be such that the upkeep would not be nearly so great and it could have a detrimental effect on the property values in the future." *Id.*, at 95.

Surely Moore's uncontroverted expert testimony is evidence of an impairment of property values, an impairment directly traceable to the closing of West Drive. The majority dismisses this aspect of Moore's testimony as "speculation." *Ante,* at 117–118. Yet the majority has no trouble crediting Moore's brief and conclusory testimony that the immediate impact of the closing would be negligible. Unlike the majority, I am unable to dismiss so blithely the balance of his comments.

The majority also gives insufficient weight to the testimony of Dr. Feit on this point. Dr. Feit testified, based on his experience as Director of Planning for Allegheny County, Pa., that the shift in traffic patterns as a result of the closing of West Drive would lower the property values for owners living north of Hein Park. He further testified that the closing of West Drive would lead to increased hostility toward Hein Park residents and, ultimately, to increased police harassment of residents of the Springdale area. Tr. 102–104, 118–120.[12] I would have thought it indisputable that increased police harassment of property owners must be construed as a significant impairment of their property interests. In _ y view, the combined testimony of Dr. Feit and real estate ex-

---

[12] The District Court expressly credited Dr. Feit's testimony that racial hostility and arrests of Negro residents would increase. App. 155. That court did not discuss Dr. Feit's testimony that property values in the area north of Hein Park would decrease as a result of the closing of West Drive. There is absolutely no record evidence contravening either Dr. Feit's or real estate agent Moore's testimony that property values would fall.

pert Moore is sufficient to demonstrate that the closing of West Drive will cause genuine harm to the property rights of the Negro residents of the area north of Hein Park.

In sum, I cannot agree with the majority's suggestion that "[t]he injury to respondents established by the record is the requirement that one public street rather than another must be used for certain trips within the city," *ante,* at 124, and that this requirement amounts to no more than "some slight inconvenience," *ante,* at 119. Indeed, as should be clear from the foregoing, the problem is less the closing of West Drive in particular than the establishment of racially determined districts which the closing effects. I can only agree with the Court of Appeals, which viewed the city's action as nothing more than "one more of the many humiliations which society has historically visited" on Negro citizens. 610 F. 2d, at 404. In my judgment, respondents provided ample evidence that erection of the challenged barrier will harm them in several significant ways. Respondents are being sent a clear, though sophisticated, message that because of their race, they are to stay out of the all-white enclave of Hein Park and should instead take the long way around in reaching their destinations to the south. Combined with this message are the prospects of increased police harassment and of a decline in their property values. It is on the basis of these facts, all firmly established by the record, that I evaluate the legal questions presented by this case.

## II

When Congress enacted § 1 of the Civil Rights Act of 1866, 14 Stat. 27, now 42 U. S. C. § 1982, it intended "to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein. . . ." *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 436 (1968). See *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410 U. S. 431, 435 (1973); *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, 235 (1969). These enumerated rights include the rights

148

"to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U. S. C. § 1982. At bottom, as the majority recognizes, § 1982 creates a right in Negroes "not to have property interests impaired because of their race." *Ante,* at 122.[13] Our decisions have recognized that the language of the statute is to be broadly construed. We have said that " '[w]e are not at liberty to seek ingenious analytical instruments,' " to carve exceptions from § 1982. *Jones v. Alfred H. Mayer Co., supra,* at 437, quoting *United States v. Price,* 383 U. S. 787, 801 (1966). On the contrary, "[a] narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866 . . . ." *Sullivan v. Little Hunting Park, Inc., supra,* at 237. If the language of the statute is given the broad reading that our cases require, then it is difficult to see how petitioners can avoid its effect.

The majority concludes that the kind of harm that § 1982 was meant to prohibit does not exist in this case, but as I have stated, a proper reading of the record demonstrates substantial harm to respondents' property rights as a result of the establishment of a barrier at the northern edge of Hein Park. The closing will both burden respondents' ability to enjoy their property and also depress its value, thus falling within the literal language of § 1982.[14] Even the majority

---

[13] Indeed, we have in the past implied that a violation of § 1982 can be made out when the challenged action *may* have an adverse impact on property values in the future. *Tillman v. Wheaton-Haven Recreation Assn., Inc.,* 410 U. S. 431, 437 (1973). See *Wright v. Salisbury Club, Ltd.,* 632 F. 2d 309, 314–316 (CA4 1980).

[14] Like the majority, I do not reach the question whether a showing of discriminatory intent is a necessary element of a violation of § 1982. JUSTICE WHITE, in his opinion concurring in the judgment, examines the language of the statute and the legislative history and concludes that a showing of racially discriminatory purpose is indeed required. I do not believe that his arguments support his conclusion. The language of the statute simply declares that "[a]ll citizens of the United States shall have

concedes that "the statute might be violated by official action that depreciated the value of property owned by [Negro] citizens." *Ante*, at 123. I believe that that is precisely what is challenged in this case.[15]

The legislative history of § 1982 also supports my conclusion that the carving out of racial enclaves within a city is

---

the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The plain language does not suggest an intent requirement, because it does not condition a violation of § 1982 on the motivation of any person or persons. There is nothing in the statute to suggest, for example, that a right denied through sheer insensitivity is entitled to less protection than one denied through racial animus. I agree with JUSTICE WHITE that the legislative history suggests a congressional intent to strike down both state laws that by their terms served to oppress the former slaves and those that were enforced with that goal in mind. But particularly in light of the broad statutory language, I find no basis for concluding that that is all that Congress meant to do. Even if JUSTICE WHITE is correct, and racially discriminatory motivation must be demonstrated under § 1982, it is enough for me if the evidence raises an inference of intent and the government fails to rebut it with a sufficiently strong explanation. And on that premise, I would certainly hold that intent must be inferred when, as here, municipal officials were acting on behalf of what they knew to be and what had always been an all-white community, were acting not in accordance with any municipal plan but instead for the sole benefit of that white community, were aware in the course of their proceedings that a predominantly Negro community would be injured by their official action, deviated significantly from their usual procedures, and gave the Negro community no meaningful opportunity to state its case. I do not believe that this inference is successfully rebutted on the facts of this case. See infra, at 152–153.

[15] The majority implies, see *ante*, at 114, n. 23, that there is analytical significance in the fact that although the defendants are the city and its officials, respondents introduced evidence as to the motivations of the private citizens who petitioned the city to close West Drive. But it is beyond dispute that § 1982 has application to official government action that merely ratifies private discriminatory conduct. See *Hurd* v. *Hodge*, 334 U. S. 24, 31–34 (1948). See also Cong. Globe, 39th Cong., 1st Sess., 1833 (1866) (remarks of Rep. Lawrence) (statute reaches State's failure to protect rights as well as its actions that infringe them).

precisely the kind of injury that the statute was enacted to prevent. In *Jones* v. *Alfred H. Mayer Co., supra,* at 422–437, this Court discussed the legislative history of the Civil Rights Act of 1866 in some detail, and there is no need to duplicate all of that discussion here. A few examples should suffice.

When the Civil Rights Act of 1866 was introduced, both its supporters and its opponents alike recognized the revolutionary scope of its intended purpose of eliminating discrimination. As we noted in *Jones* v. *Alfred H. Mayer Co., supra:*

> "That the bill would indeed have so sweeping an effect was seen as its great virtue by its friends and its great danger by its enemies but was disputed by none. Opponents of the bill charged that it would not only regulate state laws but would directly 'determine the persons who [would] enjoy . . . property within the States,' *threatening the ability of white citizens 'to determine who [would] be members of [their] communit[ies]. . . .'* " 392 U. S., at 433 (footnotes omitted; emphasis added).

Senator Van Winkle, the Member of Congress quoted by the Court in that passage from *Jones,* spoke at some length about the "dangers" inherent in the bill that would eventually become § 1982:

> "I believe that the division of men into separate communities and their living in society and association with their fellows . . . are both divine institutions . . . . We have the right to determine who shall be members of our community, and . . . I do not see where it comes in that we are bound to receive into our community those whose mingling with us might be detrimental to our interests. I do not believe that a superior race is bound to receive among it those of an inferior race . . . ." Cong. Globe, 39th Cong., 1st Sess., 498 (1866).

The Senate of course passed the bill in spite of Senator Van Winkle's fears, thus repudiating his view that white residents should enjoy the absolute right to close their communities to Negroes. In enacting § 1982, Congress was "fully aware of the breadth of the measure it had approved." *Jones* v. *Alfred H. Mayer Co.*, 392 U. S., at 433. Senator Lane, a supporter of the bill, answered the arguments of Senator Van Winkle and others by explaining that the bill would prevent a white person from "invok[ing] the power of local prejudice" against a Negro. Cong. Globe, 39th Cong., 1st Sess., at 603. Senator Trumbull, a sponsor of the legislation, made plain that it was intended to prohibit local discriminatory customs as well as discriminatory state laws. *Id.*, at 1759. During the House debate over the Civil Rights Act, Representative Cook argued that without the legislation, slavery might be perpetuated "under other names and in other forms" because "[a]ny combination of men in [a Negro's] neighborhood" might join to oppress him. *Id.*, at 1124. As we recognized in *Jones* v. *Alfred H. Mayer Co., supra,* at 427–428, one goal of the Reconstruction Congress in enacting the statute was to provide protection for Negroes when "white citizens . . . combined to drive them out of their communities." See Cong. Globe, 39th Cong., 1st Sess., at 1156, 1835; J. tenBroek, Equal Under Law 181 (rev. ed. 1965).

I do not, of course, mean to suggest that the Reconstruction Congress that enacted § 1982 anticipated the precise situation presented by this case. Nor do I wish to imply that the Act prevents government from ever closing a street when the effect is to inflict harm on Negro property owners. But because of our Nation's sad legacy of discrimination and the broad remedial purpose of § 1982, I believe that official actions whose effects fall within its terms ought to be closely scrutinized. When, as here, the decisionmaker takes action with full knowledge of its enormously dispropor-

tionate racial impact,[16] I believe that § 1982 requires that
the government carry a heavy burden in order to justify its
action. Absent such a justification, the injured property
owners are entitled to relief. There is no need to suggest
here just how great the government's burden should be, be-
cause the reasons set forth by the city for the closing of
West Drive could not, on the facts of this case, survive any
but the most minimal scrutiny.

In sustaining the closing of West Drive, the majority
points to petitioners' "[p]roper management of the flow of
vehicular traffic within a city," and their exercise of the
"unquestionably legitimate" "residential interest in compara-
tive tranquility," ante, at 126, 127.[17] Those interests might,
as the majority contends, well prove "sufficient to justify an
adverse impact on motorists who are somewhat inconven-
ienced by the street closing," ante, at 128, but that is not the
impact that the city must explain in this case. It must in-
stead justify the substantial injury that it has inflicted on
Negro citizens solely for the benefit of the white residents of
Hein Park. For that purpose, the proffered explanations are
insufficient. "[A] city's possible motivations to ensure safety
and save money cannot validate an otherwise impermissible
state action." Palmer v. Thompson, 403 U. S. 217, 226
(1971). See Watson v. Memphis, 373 U. S. 526, 537 (1963);
Cooper v. Aaron, 358 U. S. 1, 16 (1958); Buchanan v. Warley,
245 U. S. 60, 74, 81 (1917). It is simply unrealistic to sug-
gest, as does the Court, that the harm suffered by respondents

---

[16] See n. 9, supra.

[17] I do not understand the majority to dispute the conclusion by the
Court of Appeals that "[t]he proposed closing was not enacted in re-
sponse to any uniform city planning effort, directed generally to the pres-
ervation of the residential neighborhoods throughout the city." 610 F. 2d,
at 404. That statement would in fact be difficult to dispute in light of
the testimony by a city official that a street closing for traffic control pur-
poses is in fact unprecedented. See Tr. 297–298 (testimony of Paul
Goldstein). Of course, the result that I reach does not turn on the
accuracy of the statement by the Court of Appeals.

has no more than "symbolic significance," *ante,* at 128, and it defies the lessons of history and law to assert that if the harm is only symbolic, then the federal courts cannot recognize it. Compare *Plessy* v. *Ferguson,* 163 U. S. 537, 551 (1896) ("We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it"), with *Brown* v. *Board of Education,* 347 U. S. 483, 494 (1954) ("To separate them from others . . . solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. . . . Whatever may have been the extent of psychological knowledge at the time of *Plessy* v. *Ferguson,* this finding is amply supported by modern authority"). The message the city is sending to Negro residents north of Hein Park is clear, and I am at a loss to understand why the majority feels so free to ignore it.

Indeed, until today I would have thought that a city's erection of a barrier, at the behest of a historically all-white community, to keep out predominantly Negro traffic, would have been among the least of the statute's prohibitions. Certainly I suspect that the Congress that enacted § 1982 would be surprised to learn that it has no application to such a case. Even the few portions of debate that I have cited make clear that a major concern of the statute's supporters was the elimination of the effects of local prejudice on Negro residents. In my view, the evidence before us supports a strong inference that the operation of such prejudice is precisely what has led to the closing of West Drive. And against this record, the government should be required to do far more than it has here to justify an action that so obviously damages and stigmatizes a racially identifiable group of its citizens.

154

In short, I conclude that the plain language of § 1982 and its legislative history show that the harm established by a fair reading of this record falls within the prohibition of the statute. Because the Court of Appeals reached the same conclusion, I would affirm its judgment.[18]

[18] In light of my disposition of the statutory question, I would ordinarily find it unnecessary to consider the merits of the Thirteenth Amendment argument. But I cannot let the Court's discussion of the constitutional claim pass without comment. The majority reserves until another case the issue whether § 1 of the Amendment by its own force bans "badges and incidents of slavery" because, in its view, "a review of the justification for the official action challenged in this case demonstrates that its disparate impact on black citizens could not . . . be fairly characterized as a badge or incident of slavery." *Ante,* at 126. For reasons that I have already indicated, I believe that the degree of harm to respondents from the erection of a barrier at the end of West Drive far exceeds the minimal inconvenience found by the majority. Assuming with the majority that the Amendment would, even without implementing legislation, ban more than the mere practice of slavery, I would conclude that official action causing harm of the magnitude suffered here plainly qualifies as a "badge or incident" of slavery, at least as those terms were understood by the Reconstruction Congress.

When the Thirteenth Amendment was being debated, supporters and opponents alike acknowledged that it would have the effect of striking down racial discrimination in a wide variety of areas. See, *e. g.,* Cong. Globe, 38th Cong., 1st Sess., 1465, 2944, 2962, 2979, 2982–2983, 2987 (1865). See generally J. tenBroek, Equal Under Law 162–168 (rev. ed. 1965). In enacting § 1 of the Civil Rights Act of 1866, the provision that produced both § 1981 and § 1982, see *Runyon* v. *McCrary,* 427 U. S. 160, 168, n. 8, 170 (1976), Congress did not believe it was doing more than spelling out the guarantees implicit in § 1 of the Thirteenth Amendment. See Cong. Globe, 39th Cong., 1st Sess., 503–504 (1866) (remarks of Sen. Howard); *id.,* at 602–603 (remarks of Sen. Lane); R. Kluger, Simple Justice 47, 627–629 (1975). Because that Congress included so many of those who had a hand in drafting the Thirteenth Amendment, cf. *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 439–440 (1968), I would give its judgment considerable deference. Consequently, I would hold that because the closing of West Drive is forbidden on these facts by § 1982, it is *a fortiori* a violation of the Thirteenth Amendment as well. Of course, this should not be taken as an argument that Congress *cannot* under § 2 of the Thirteenth Amendment enact legislation forbidding more than would § 1 of the Amend-

## III

I end, then, where I began. Given the majority's decision to characterize this case as a mere policy decision on the part of the city of Memphis to close a street for valid municipal reasons, the conclusion that it reaches follows inevitably. But the evidence in this case, combined with a dab of common sense,. paints a far different picture from the one emerging from the majority's opinion. In this picture a group of white citizens has decided to act to keep Negro citizens from traveling through their urban "utopia," and the city has placed its seal· of approval on the scheme. It is this action that I believe is forbidden, and it is for that reason that I dissent.

---

ment standing alone. I simply suggest that Congress *did not* do so when it enacted § 1 of the Civil Rights Act of 1866.

I also do not mean to imply that all municipal decisions that affect Negroes adversely and benefit whites are prohibited by the Thirteenth Amendment. I would, however, insist that the government carry a heavy burden of justification before I would sustain against Thirteenth Amendment challenge conduct as egregious as erection of a barrier to prevent predominantly Negro traffic from entering a historically all-white neighborhood. For reasons that I have already stated, I do not believe that the city has discharged that burden in this case, and for that reason I would hold that the erection of the barrier at the end of West .Drive amounts to a badge or incident of slavery forbidden by the Thirteenth Amendment.