Seretta C. McKNIGHT and Betty Baldwin, Plaintiffs,

v.

Carl T. HAYDEN, Chancellor of New York State Board of Regents, Dr. Daniel A. Domenech, George A. Jackson, and Lavinia Dickerson, Defendants.

Seretta C. McKnight, Douglas Mills, Barry L. Baldwin, Emily Moore, Dorothy Boxley, Beverly Cunningham, Lilian Jackson, and Irving C. McKnight, Sr., As Residents and Voters of the Roosevelt Long Island, Union Free School District, Plaintiffs,

v.

State of New York, Defendant.

Nos. 96 CV 250(NG)(ETB), 97 CV 4480(NG)(ETB).

United States District Court, E.D. New York.

Sept. 10, 1999.

Armando Montano, Bronx, NY, Edward H. Wolf, of counsel, for plaintiffs in 97 CV 4480.

Robert J. Valli, Jr., Leeds & Morelli, Kew Gardens, NY, for plaintiffs in 96 CV 250.

Eliot Spitzer, Attorney General of the State of New York, Robert K. Drinan, of counsel, Mineola, NY, for defendants.

## OPINION AND ORDER

GERSHON, District Judge.

These related cases challenge the constitutionality of legislation, 1995 N.Y.Laws Ch. 145 ("Legislation"), enacted in June 1995 providing for comprehensive intervention in the Roosevelt Union Free School District, located within the town of Hempstead in Nassau County, New York, and the subsequent removal of plaintiffs Seretta McKnight ("McKnight") and Betty Baldwin ("Baldwin") from the Roosevelt School Board ("School Board") pursuant to an order issued by the New York State Board of Regents on January 2, 1996. In *McKnight, et al. v. Hayden, et al.*, 96 CV 250 ("First Action"), McKnight and Baldwin, as both eligible voters and former members of the School Board, contend that their removal from the Roosevelt School Board was improper because it "disenfranchised" the voters of Roosevelt in violation of the Fourteenth and Fifteenth Amendments. In addition, McKnight claims that her removal was in retaliation for statements she made during her campaign for a seat in the Nassau County Legislature and was therefore in violation of her rights under the First Amendment.[1] In *McKnight, et al. v. State of New York*, 97 CV 4480 ("Second Action"), plaintiffs, as voters and residents of the Roosevelt Union Free School District, challenge the constitutionality of the Legislation under the Thirteenth, Fourteenth and Fifteenth Amendments, as well as Article 1, Section 11, of the New York State Constitution.[2] In the Second Action,

---

1. By Order dated August 24, 1996, the Honorable Thomas C. Platt, D.J., to whom this case was previously assigned, dismissed plaintiffs' substantive and procedural due process claims and held that Chancellor Hayden is absolutely immune from damages.

2. On February 19, 1998, the court approved a stipulation by the parties adding New York

plaintiffs also assert that defendants willfully and deliberately attempted to evade the mandate under 42 U.S.C. § 2000 *et seq.* to desegregate. Defendants have moved for summary judgment on all claims in both actions. The parties agreed on oral argument to treat the factual record created in each case as applicable to both cases.

## FACTS

Unless otherwise indicated, the following facts are undisputed: In June 1995, the New York State Legislature enacted legislation (Ch. 145, L.1995) relating to the Roosevelt Union Free School District. The Roosevelt Union Free School District is located within the town of Hempstead in Nassau County, Long Island, and comprises three elementary schools, a primary school, a junior-senior high school ("Jr.–Sr. High School"), and a pre-kindergarten program. The ethnic composition of the approximately 3000 students in the District is over 90% African–American. The Roosevelt School Board is a five-person board, the members of which are elected by residents of the Roosevelt Union Free District for a three-year term of office. From about September 1992 to about January 3, 1996, McKnight was a member of the School Board (she was appointed in 1992 to a vacancy and elected in June 1993 to a three-year term); she was voted its president in July 1995. From July 5, 1995 to about January 3, 1996, Baldwin was a member of the Roosevelt School Board. McKnight and Baldwin are African–American.

### The Crisis in the Roosevelt School District, 1995–1996

The Roosevelt School Board directed a survey of the physical condition of the school and administration buildings in 1995 which revealed deteriorating conditions, including, *inter alia,* chipped paint, unsafe bathrooms, broken lockers, blocked fire exits and extinguishers, an inoperative heating system and nonexistent smoke detectors. McKnight testified at her deposition that serious fire code violations existed at some school buildings and that some buildings were unsafe. In fact, some of the schools lacked certificates of occupancy. Baldwin described dangerous conditions at the schools, including broken windows, no seats on toilets in the girls' bathrooms, broken mirrors, dented and broken lockers and inoperative fire alarms at the Jr.–Sr. High School. The Ulysses Bias Elementary School had dangerous steps and elevators, and the Washington Rose School had no doors on some of the bathroom stalls. All the buildings had leaking roofs, and buckets were used to catch rainwater. Baldwin stated that she was concerned that the roof at the Centennial School would collapse and indicated that all the schools needed new doors. Most of the textbooks were outdated and some were at least ten years old. Severe discipline problems existed at the Jr.–Sr. High School, where "quite a few fights" occurred and weapons were being brought into the school because of the defective metal detectors. Baldwin's son attended one year at the Jr.–Sr. High School but Baldwin's daughter refused to attend the Jr.–Sr. High School. On the date that Baldwin was deposed, October 9, 1997,

State as a defendant only for the purpose of challenging the constitutionality of the Legislation and dismissing all claims against all other named defendants. The Stipulation provides in relevant part:

> The State of New York is hereby added to the caption as defendant for the sole purpose of allowing plaintiffs to challenge the constitutionality of the special legislation applicable to Roosevelt, New York (L.1995, ch. 145). In defending the statute, the At-

torney General of the State of New York, on behalf of the State of New York, reserves the right to advance any arguments, claims and/or defenses. Plaintiffs discontinue all claims against each named defendant and discontinue with prejudice the instant federal action against each named defendant.... The sole remaining defendant in the instant federal action is the State of New York.

both of her children attended a private school in Brookville. On January 2, 1996, the Roosevelt School Board closed down all five public schools within the Roosevelt School District because they lacked certificates of occupancy and posed safety risks.

## The Financial Conditions of the Roosevelt School District

The budget for the Roosevelt School District was over 30 million dollars for the 1995–1996 term; over half the budget consisted of state aid. The budget for the Roosevelt School Board for the 1994–1995 academic year was $41,550. The Board exceeded its 1994–1995 budget by over $15,000 because Board members had attended three out-of-state conferences that cost $23,151. For the 1995–1996 academic year, the Board's budget was $27,350, with $5000 allocated for conferences. In July 1995, the Board voted to attend three conferences in the 1995–1996 academic year. The Board exceeded its allocation in November 1995 with a conference in Dallas, Texas. The audit report that was conducted with respect to the Roosevelt Union Free School District also criticized other aspects of the District's finances.

## Legislative History and Background of the Legislation

Since 1990, the Roosevelt Jr.–Sr. High School had been designated a school under registration review ("SURR") by the State Education Department as a low-performing school. *See* N.Y.Comp.Codes R. & Regs. tit. 8, § 100.2(p)(5)(i) (1998). Following the identification of a school for registration review, the regulations require the commissioner to appoint a team to undertake a resource, planning, and program audit of the district and the school. *Id.* Ultimately, the New York State Commissioner of Education has the authority, if he or she determines that progress has not been made, to revoke the registration of a SURR school. *Id.* § 100.2(p)(5)(v).

In accordance with these regulations, members of the Regents Low–Performing Schools Advisory Council visited the Jr.–Sr. High School on March 21, 1995, On April 12, 1995, District Superintendent Domenech met with Superintendent Singleton and conducted a preliminary visit to the Jr.–Sr. High School. Dr. Domenech returned to the school on April 25th and 26th with a team to investigate. Dr. Domenech subsequently issued a report describing the team's findings and recommendations based on its investigation. The team recommended that legislation be passed authorizing the Commissioner of Education or the District Superintendent to assume immediate control of the district's operation until the team's recommendations had been implemented and safe conditions had been restored to the school. In June 1995, the Legislature enacted legislation directed at all the schools, not just the Jr.–Sr. high school, within the Roosevelt Union Free School District, and, in doing so, made the following legislative findings and declaration:

> The board of regents has informed the legislature of the serious need for corrective action at the Roosevelt Union Free School District. In connection therewith they have provided the legislature with a report of the state education department prepared as the result of the department's investigation of the schools of the Roosevelt Union Free School District. The state education department has urged the enactment of legislation providing for comprehensive intervention in such school district which would allow the supersession and suspension of the board of education of such district in order to implement an emergency corrective action plan. The legislature finds that an emergency may exist in such district that threatens the health, safety and educational welfare of school children attending the schools of the district. The legislature further finds that corrective action may be necessary and declares that a special meeting of the board of regents must be convened immediately to consider

whether there is a need for corrective action.

1995 N.Y.Laws Ch. 145, § 1.

**The Legislation**

The Legislation directs the Board of Regents to hold a special meeting within two days of the effective date of the Act. *Id.* § 2. If the Board of Regents determines that immediate corrective action is necessary, the Legislation empowers the Board of Regents to create a district review panel ("the Panel"). *Id.* § 3(a). The Legislation establishes qualifications for the Panel members and creates a citizen's advisory council of eleven voting members, all of whom, except for the student member and the members of the educational community, are required to be registered voters in Roosevelt. *Id.* §§ 3 & 4. The Legislation also requires the Panel, in consultation with the Board of Education of the Roosevelt Union Free School District, to submit to the Board of Regents for approval a corrective action plan ("Plan") to improve student achievement and learning, to assure that all schools of the district meet or exceed minimum educational standards, as determined by the Board of Regents, to assure that all school facilities are properly maintained, are in a good state of repair and meet all applicable health and safety standards, to assure that all fiscal and administrative practices are sound and effective, and to assure that accountability measures and internal controls are established. *Id.* § 3(c). The Plan must include a timetable for the reasonable attainment of the goals set forth in this subdivision and the method by which the attainment of such goals shall be measured. *Id.* The Panel must also take reasonable steps to solicit community input during development of the plan, which shall include but need not be limited to consultation with the citizen's advisory council established pursuant to section 4 of the Act. *Id.* The Panel must submit this corrective action plan to the Board of Regents for approval no later than July 31, 1995, and the Regents must determine whether to approve, disapprove or direct resubmission of the Plan within 5 days of its receipt. *Id.* §§ 3(d) & (e). The corrective action plan approved pursuant to subdivision (d) must set forth any reallocation of local resources necessary to implement the plan. *Id.* § 3(f). The Plan must be implemented by the Board of Education of the Roosevelt Union Free School District, and the Panel must provide advice to the Board of Education regarding implementation of the Plan and monitor the activities of the Board, including overseeing their recruitment and hiring practices and the management of the operations of the school district and providing any other technical assistance which may be necessary. The Panel must report not less than monthly to the Board of Regents and the Commissioner of Education concerning the implementation of the Plan, the general management of the district by the Board of Education and such other matters as may be deemed necessary. *Id.* § 3(g). In the event the Panel determines that the Board of Education has "significantly failed to meet the goals of the corrective action plan ...", the Panel must recommend to the Board of Regents that the terms of office of the persons then comprising the Board of Education of the Roosevelt Union Free School District be terminated. *Id.* §§ 3(i) & (j). In the event that the Board of Regents, after providing the members of the Board of Education with an opportunity to be heard, concurs with the recommendation of the Panel to terminate the terms of office of the members of the Board of Education, the Board of Regents must order such termination. *Id.* § 3(j). In the event of such termination, the Panel must perform all duties and responsibilities of the Board of Education until newly elected Board members assume office. *Id.* § 3(j). The Legislation further prescribes a schedule for the elections of new Board members.

**Actions by the Panel and the Board of Regents Pursuant to the Legislation**

Pursuant to the Legislation, the Board of Regents convened and determined that

immediate action was necessary and, in July of 1995, appointed Dr. Daniel A. Domenech, Ms. Lavinia Dickerson, Mr. George Jackson and Dr. Lottie Taylor to the Panel. Prior to July 31, 1995, the Panel and the Board of Regents developed a corrective action plan ("Plan") identifying twelve goals:

1. Adoption and dissemination of codes of student conduct and discipline.

2. Reduction in the number of disruptive incidents and student suspensions at the schools.

3. Improvement of the patterns of professional and student attendance.

4. Achievement of academic parity with the average performance of students in Nassau County school districts on all state administered tests.

5. Staff Development to assure the attainment of academic goals.

6. Board of Education Development.

7. Parental Involvement in the Education Process.

8. Incorporation of School Based Management into the district's management and administrative system.

9. Implementation of the recommendations stated in the Administrative Management Survey prepared by the State Education Department in September 1995.

10. Establishment of an administrative support team to assist the district with the implementation of the plan.

11. Compliance of all school facilities with safety standards in state and local codes.

12. Repair of all school facilities to provide an environment conducive to student learning.

The Plan also detailed specific actions that the Roosevelt Board of Education was required to take and dates by which the action was required. The Board of Regents approved the Plan on August 8, 1998, and it reapproved the Plan, with modifications, on November 3, 1995.

On December 4, 1995, the Roosevelt School Board decided to suspend superintendent Singleton and hire Dr. Taylor as the interim superintendent of schools. According to defendants, the Commissioner wrote to the Board following the appointment of Dr. Taylor and admonished it to take no further personnel actions without prior consultation with the Panel. The School Board subsequently acted, however, on some additional personnel matters, including the hiring and termination of particular teachers. It is the plaintiffs' contention that the Panel never consulted with the Board as mandated by the Legislation and, consequently, they did not think that they had to consult with the Panel before making decisions normally within the Board's mandate. In its December 15, 1995 monthly report to the Board of Regents, the Panel reported that the Board of Education had significantly failed to meet the goals of the Plan and recommended that the members' terms of office be terminated. By order of the Board of Regents dated December 18, the five members of the Roosevelt Board of Education were advised that a hearing would be held on January 2, 1996. The order notified the board members that the purpose of the hearing was to determine whether their offices should be terminated for their alleged failure to implement the Plan and informed the board members of the pending allegations against them. McKnight submitted a statement, dated January 2, 1996, to the Board of Regents and the Commissioner of Education in response to "the charges." The hearing was held before the Board of Regents on January 2, 1996 and by order dated January 3, 1996, the Board of Regents terminated the offices of all five board members, Betty Baldwin, Theodore Hatwood, Seretta McKnight, Oliver Stroker and Reginald Taylor. In its decision dated January 12, 1996, the Board of Regents found that the Board of Education had "significantly failed to meet the goals of the corrective

action plan as set forth in § 3(c) of the statute." The Panel ran the Roosevelt School Board from January to May 1996. Pursuant to the Legislation, elections were held in May 1996 and a new Board was elected.

In April 1996, McKnight and Baldwin commenced an Article 78 proceeding in state court to review the propriety of the Regents action and on September 27, 1996, the State Supreme Court, Ulster County, issued a decision finding that the record "abundantly supports the Regents' conclusion that removal was warranted." The court also found that "the fact that Education Law § 306 allows removal of board members for a willful violation of law or neglect of duty did not in any way bar the Legislature and Governor from approving special legislation creating a different standard of removal." Def.Ex. K.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not

"rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is genuine factual issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## Section 1983 Claims

To maintain an action under Section 1983, plaintiffs must demonstrate conduct committed by a person acting under color of law that deprived them of rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. In the Second Action, plaintiffs allege that the enactment of the Legislation violated the Thirteenth Amendment, their right to equal protection of the laws as guaranteed by the Fourteenth Amendment and their right to vote as guaranteed by the Fifteenth Amendment. In the First Action, plaintiffs allege that their removal from the Roosevelt School Board disenfranchised the voters of Roosevelt in violation of the Fourteenth and Fifteenth Amendments. McKnight also alleges that her removal from the School Board was in retaliation for statements she made during her campaign for a seat in the Nassau County Legislature and was therefore in violation of her rights under the First Amendment.

### 1. Thirteenth, Fourteenth and Fifteenth Amendment Claims Challenging the Legislation

In the Second Action, plaintiffs, as residents and voters of the Roosevelt Union Free School District, argue that the June 1995 Legislation was enacted with a discriminatory purpose in violation of the Thirteenth Amendment and the equal protection of the laws guaranteed by the Fourteenth Amendment and that the Legislation effectively deprived them of their right to vote in violation of the Fifteenth Amendment.

The Equal Protection Clause of the Fourteenth Amendment demands that

no State shall "deny to any person within its jurisdiction the equal protection of the laws," which, according to the Supreme Court, is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted). Once similarly situated classes are identified, the level of scrutiny to be applied to a facially neutral law, such as this Legislation, depends upon whether the statute impinges on a fundamental right or involves a suspect classification. *See Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). To establish that a law is racially discriminatory in violation of the Equal Protection Clause, the invidious quality of a law must ultimately be traced to a racially discriminatory purpose. *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See also Ricketts v. City of Hartford,* 74 F.3d 1397, 1407 (2d Cir.1996) ("It is well established that a claimant under the Fourteenth Amendment's Equal Protection Clause ... must establish intentional discrimination.") This finding requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Subjects of proper inquiry in determining whether racially discriminatory intent existed include the impact of the official action, whether it "bears more heavily on one race than another," *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040, the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes, the specific sequence of events leading up to the challenged decision, departures, particularly substantive ones, from the normal procedural sequence, and the legislative history, especially where there are contemporary statements made by members of the decision-making body, minutes of its meetings, or reports. *Arlington Heights,* 429 U.S. at

266–68, 97 S.Ct. 555. In making this sensitive inquiry, it is important to note that the legislature is presumed to act constitutionally, *see Butts v. City of New York,* 779 F.2d 141, 147 (2d Cir.1985) (citations omitted), and "courts should be 'reluctant to attribute unconstitutional motives to the state, particularly where a plausible [constitutional] purpose may be discovered from the face of the statute.'" *Id.* (brackets in the original). Strict scrutiny is triggered only if and when a plaintiff satisfies its proof of racial animus. *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040.

■ Here, plaintiffs have not identified classes that are similarly situated. Although plaintiffs allege in their complaint that "special" legislation was not enacted by the Legislature to remedy the problems existing in other districts with predominantly white populations, plaintiffs have failed to identify a non-minority school district whose conditions were as bad or worse than Roosevelt's.

Even assuming *arguendo* that plaintiffs could identify similarly situated classes, plaintiffs have not produced any evidence of discriminatory animus or intent in the passage of the Legislation. Plaintiffs recognize that the legislation is neutral on its face. Moreover, the Legislature's legitimate purpose in enacting the Legislation is established beyond dispute. The Roosevelt School District was in a crisis, as McKnight and Baldwin themselves testified, with severe academic, physical and financial problems. Indeed, the Board had to close down all five schools within the District in January 1996, after the passage of the Legislation, because the schools lacked certificates of occupancy and were considered safety hazards. The Jr.–Sr. High School had been a SURR school since 1990, and it was the Board of Regents, which is authorized to exercise legislative and policy making functions with respect to the State's education system, *see* N.Y. Education Law § 207, that actually recommended that the Legislation be passed. As the Legislature noted, the

Board of Regents informed the Legislature of the "serious need for corrective action at the Roosevelt Union Free School District" and provided the Legislature with a report prepared by the state education department after its investigation of the schools of the Roosevelt Union Free School District. The Legislature declared that a special meeting of the Board of Regents had to be convened immediately to consider whether there was a need for corrective action.

While other school districts may have been in distress, the Legislature is not constitutionally required to respond to every district. In enacting the Legislation, the Legislature emphasized the emergency nature of the situation in the Roosevelt School District, for which the existing regulations, N.Y. Education Law §§ 306 and 1706, proved inadequate. Education Law §§ 306 and 1706 provide for removal of a member of a school board only for a willful violation or neglect of duty; it is not disputed that the willfulness element would not have been present here. As the state court found in the Article 78 proceeding, "the fact that Education Law § 306 allows removal of board members for a willful violation of law or neglect of duty did not in any way bar the Legislature and Governor from approving special legislation creating a different standard of removal."

The bill was passed in the Assembly by a vote of 138 to 12, and it passed in the Senate by a vote of 56 to 1, with all minority members voting for the bill. There is not a single remark by any proponent of the Legislation that suggests any improper purpose. Nor do plaintiffs rely on any of the legislative history of the Legislation to support their contentions, see *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555, except to say that the Legislature did not follow the normal deliberative process because they relied, without discussion, on the report prepared by the Board of Regents. However, they do not claim that any of the individuals who prepared the report acted with discriminatory intent. In fact, Baldwin testified that she did not believe that the individual defendants harbored any racial animus.

The Commissioner's Regulations in effect at the time of this dispute provide that "[u]pon approval of revocation of registration by the Board of Regents, the commissioner will develop a plan to ensure that the educational welfare of the pupils of the school is protected. Such plan shall specify the instructional program into which pupils who had attended the school will be placed, how their participation in the specified programs will be funded, and the measures that will be taken to ensure that the selected placements appropriately meet the educational needs of the pupils." N.Y.Comp.Codes R. & Regs. tit. 8, § 100.2(p)(5)(v) (1998). Plaintiffs rely on this regulation to argue that, since there was no other Jr.–Sr. High School in the Roosevelt Union Free School District, the decertification of the Roosevelt Jr.–Sr. High School would have resulted in busing a significant number of the predominantly African–American Roosevelt students into the more affluent and predominantly white school districts located east of Roosevelt: Merrick, Merrick/Bellmore, Wantagh and Seaford. The only evidence that plaintiffs proffer to support this claim is a statement allegedly made by a now deceased State Senator, one of the sponsors of the Legislation who was a representative of the predominantly white district of Merrick, to McKnight in late March or early April of 1996 after the Legislation had been enacted. According to McKnight, the State Senator indicated that "the school districts adjacent to the Roosevelt Union Free School District would never accept a solution involving the closing down of Roosevelt's one and only junior-senior high school because busing would be unacceptable to his districts." McKnight Aff. ¶ 6. Even accepting this statement as admissible, although plaintiffs have not proffered any basis for its admissibility, one senator's opposition to busing is insufficient to raise an issue of fact as to intentional

racial discrimination in the face of overwhelming evidence of the Legislation's neutral purpose.

Accordingly, plaintiffs having failed to demonstrate the existence of similarly situated classes and discriminatory intent in the enactment of the Legislation, defendants' motion for summary judgment on plaintiffs' Equal Protection claim in the Second Action is granted.

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The standard for a Fifteenth Amendment violation is the same as the standard for a Fourteenth Amendment violation. *Butts v. City of New York,* 779 F.2d 141, 143 n. 1 (2d Cir.1985) (citing *Mobile v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)). As with plaintiff's Fourteenth Amendment claim, to support a claim of vote denial on Fifteenth Amendment grounds, plaintiffs must establish intentional discrimination on account of race, color, or previous condition of servitude. *Baker v. Pataki,* 85 F.3d 919, 926 (2d Cir.1996). Because plaintiffs have produced no evidence of racial animus, defendants' motion for summary judgment on plaintiffs' Fifteenth Amendment claim in the Second Action is also granted.

Insofar as plaintiffs raise a claim under the Thirteenth Amendment, plaintiffs proffer no facts showing how the statute complained of is used to further the "conditions of involuntary servitude", or the "badges and incidents of slavery." *City of Memphis v. Greene,* 451 U.S. 100, 125, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (internal quotation omitted). In any event, even if the scope of the Thirteenth Amendment is extended to cover plaintiffs' claim, they have made no showing of racial animus. *Id.* at 126–28, 101 S.Ct. 1584; *see supra* pp. 120–122. Thus, this claim is also dismissed.[3]

### 2. McKnight's and Baldwin's Fourteenth and Fifteenth Amendment Claims Challenging their Removal

In the First Action, McKnight and Baldwin, as eligible voters and former members of the School Board, argue that their removal from office disenfranchised the voters of Roosevelt in violation of the Fourteenth and Fifteenth Amendments. Defendants raise, *inter alia,* the defense of qualified immunity. The Supreme Court has instructed courts that "[a] court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)).

Here, McKnight and Baldwin identify the two Panel reports issued in September and December of 1995 and their subsequent removal from the Board of Education as evidence of racial discrimination. According to McKnight and Baldwin, these two reports contained inaccurate information regarding the situation in the Roosevelt School District. As before, even if plaintiffs can establish similarly situated classes for their Equal Protection claim, they have proffered no evidence of

---

3. In their papers in opposition to the motion for summary judgment, plaintiffs made no mention of their Title VII claim. On oral argument they acknowledged that Title VII is inapplicable here and argued that they were really pursuing a claim under *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), not Title VII. Plaintiffs argued.that the African–American children in Roosevelt are in a segregated school district contrary to the mandate of *Brown.* The State of New York did not consent to be sued on this ground, *see* Stipulation of February 19, 1998, and, in any event, plaintiffs have made no attempt to establish the evidentiary basis for such a claim.

racial animus, *i.e.*, discriminatory intent by any of the Panel Members in preparing their reports for the Board of Regents or in subsequently recommending plaintiffs' removal from office. Because I find that plaintiffs have not proffered proof of discrimination and therefore cannot establish a deprivation of their Fourteenth and Fifteenth Amendments rights, it is not necessary to reach the issue of whether the rights allegedly implicated were clearly established at the time of the events in question, *see Wilson*, 526 U.S. at ——, 119 S.Ct. at 1697, nor to reach the issue of absolute immunity. Accordingly, defendants' motion for summary judgment on plaintiffs' Fourteenth and Fifteenth Amendment claims in the First Action is granted.

### 3. McKnight's First Amendment Claim

McKnight also brings a First Amendment claim under Section 1983, claiming that her removal from the School Board was in retaliation for statements she made during her campaign for a seat in the Nassau County Legislature. Defendants raise the defense of qualified immunity. As discussed above, this court shall determine first whether McKnight has alleged a deprivation of her First Amendment rights.

McKnight claims that the enactment of the Legislation and her subsequent removal by the Panel and Board of Regents pursuant to that Legislation were retaliatory measures intended to chill her political speech. Specifically, McKnight alleges, as she does with respect to her Fourteenth and Fifteenth Amendment claims in the First Action, that the Panel (defendants Domenech, Jackson and Dickerson) submitted monthly reports to the Board of Regents that contained inaccurate information regarding the situation in the Roosevelt School District.

■ Government employees have a limited right under the First Amendment to speak out on matters of public concern.

*See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). To plead a prima facie case that they were removed in violation of their First Amendment rights, government employees must establish that their speech can be " 'fairly characterized as constituting speech on a matter of public concern' " and "that the speech was at least a 'substantial' or 'motivating' factor in the discharge." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993) (citation omitted). The first element is a question of law; the second is a question of fact. *See id.*

In support of her claim that she made speeches that touched on a matter of public concern, McKnight testified at her deposition that she handed out leaflets, posted posters in the community, marched in parades, spoke at churches, and had buttons which advertised her campaign for the Nassau County legislature. McKnight stated that when she ran for the Nassau County legislature in 1995, she spoke about issues concerning the inequity in funding and the redistribution of wealth in the educational structure. According to McKnight, she publicly asserted that there is a gross inequity in terms of how districts of color are funded and how districts of color receive money. The subjects of McKnight's speeches were clearly matters of public concern.

■ However, McKnight cannot establish that her campaign speech "was at least a 'substantial' or 'motivating' factor in [her] discharge." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993); *Cf. Hagemann v. Molinari*, 14 F.Supp.2d 277, 284 (E.D.N.Y. 1998). Establishing a nexus between the exercise of First Amendment rights and an employer's alleged retaliatory response involves defendants' motive and intent, issues which are not usually amenable to summary judgment. *See DeGennaro v. New York City Housing Authority*, No. 92 Civ. 5985, 1995 WL 37850, at *3 (S.D.N.Y. Jan.31, 1995) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir.1988)),

*aff'd* 71 F.3d 405 (2d Cir.1995). Nevertheless, to avert summary judgment, plaintiff must at least proffer facts which would permit the trier of fact to draw an inference of retaliation. *DeGennaro,* 1995 WL 37850, at \*3; *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994).

Here, McKnight has produced no evidence that could lead a reasonable jury to conclude that any of the defendants had any motive to retaliate based on her views. McKnight asserts that the Panel (defendants Domenech, Jackson and Dickerson) submitted inaccurate monthly reports to the Board of Regents regarding the situation in the Roosevelt School District and that these reports constituted retaliatory measures intended to chill her political speech. However, McKnight has not presented facts to support any inference connecting the reports with her campaign. The reports issued by the Panel in November and December 1995 described the conditions at the Roosevelt schools and the implementation of the corrective action plan, but did not mention McKnight's campaign. McKnight does not provide the necessary nexus linking her speech to the Board's actions or the Panel's reports. *See, e.g., Hankard v. Town of Avon,* 126 F.3d 418 (2d Cir.1997) (affirming summary judgment where plaintiffs' allegations of a First Amendment violation were speculative, indirect and remote). Accordingly, defendants' motion for summary judgment is granted as to plaintiff's First Amendment claim.

## CONCLUSION

Defendants' motion for summary judgment in both actions is granted in its entirety. All claims in both actions, 96 CV 250 and 97 CV 4480, are hereby dismissed. **SO ORDERED.**